[No. 3120, May 2, 1927. Rehearing Denied Sept. 10, 1927]

STATE v. Massey.

[258 Pac. 1009]

### SYLLABUS BY THE COURT

1. Any evidence that tends to show that the defendant had a motive for killing the deceased is always relevant as rendering more probable the inference that he did kill him.

2. While circumstances immediately or shortly preceding the homicide are competent as part of the res gestae, nevertheless what facts may be shown under this rule depends upon their nature and connection with the fatal act and the other circumstances determining their relevancy. No effort was made to show the trial court the relevancy or materiality of the excluded evidence. A mere exception on the ground that the statement was a part of the res gestae was made. For this and other reasons it is **held** that the trial court did not err in excluding the evidence.

---

[1] 30CJ p. 179 n. 37.     [2] 16CJ p. 373 n. 43; 574' n. 45, 46; p. 577 n. 79; 30 CJ p. 193 n. 53; p. 199 n. 29.     [3 4] 3CJ p. 816 n. 19; p. 817 n. 20, 21; 16CJ p. 874 n. 99; p. 879 n. 56; p. 880 n. 74; 17CJ p. 56 n. 16; p. 58 n. 24; p. 71 n. 47.     [5] 17CJ p. 58 n. 29 New.     [6] 30CJ p. 317 n. 69.     [7] 16CJ p. 984' n. 37; p. 1013 n. 46; p. 1063 n. 85; 30 CJ p. 336 n. 70.

3. As a general rule, an objection to the admission of evidence must be taken at the time the evidence is offered or introduced, or it will be deemed waived, and will not be considered on appeal. It should always be made at the earliest opportunity after the objection becomes apparent.

4. If the evidence, apparently inadmissible when introduced, might be made admissible by other testimony, and the party offering the objectionable testimony fails to connect it up so as to show its admissibility, it is incumbent upon the objecting party to direct the attention of the trial court to this fact and renew his motion to strike the objectionable testimony.

5. Objections not made in the trial court to a question propounded to a witness will not be considered on appeal.

6. The record examined, and **held**, that the verdict is supported by substantial evidence.

7. The requested instructions of defendant examined, and **held** to be properly refused; they being sufficiently covered by the court's general instructions.

Appeal from District Court, Chaves County; Brice, Judge.

W. C. Massey was convicted of voluntary manslaughter, and he appeals. Affirmed.

O. E. Little, of Roswell, for appellant.

Fred E. Wilson, Atty. Gen., and Jas. N. Bujac, Asst. Atty. Gen., for the State.

OPINION OF THE COURT

BICKLEY, J.    The appellant, W. C. Massey, together with his son Cecil Massey, was charged with the murder of Jim Taylor.    At the close of the evidence, the court instructed the jury to return a verdict of not guilty as to the defendant Cecil Massey.    The jury returned a verdict that the appellant was guilty of voluntary manslaughter, requesting the clemency of the court.

The appellant with his family resided in Roswell, as did also the deceased, Jim Taylor.    The appellant owned a ranch and some live stock.    Deceased also owned live stock, and during a period of drought induced appellant to permit him to put his stock upon appellant's

ranch; it being apparently a temporary arrangement. Eventually the appellant requested the deceased, Jim Taylor, to move his stock from the ranch. There was heated controversy between the deceased and the appellant on this subject, as well as other difficulties between them concerning the administration of affairs on the ranch. Appellant was indebted, which indebtedness was secured by mortgage upon appellant's cattle. It is in evidence that some one had killed some of these mortgaged cattle, and that deceased had pointed out certain heads and paunches to inspectors representing the mortgagee. The State sought to show by a witness that appellant was uneasy concerning knowledge by the deceased and was apprehensive that the deceased would be a witness against him in case of an investigation relative to the destruction of this mortgaged property. There was testimony of a witness who claimed to have eavesdropped upon a conversation between appellant and his son Cecil Massey, in which the appellant said that he guessed they would have to kill Jim Taylor before they got him away, or he would get them in trouble about the hides. This witness varied his testimony somewhat in different portions of his testimony, but in substance testified as heretofore stated. Some effort was also made to impeach this witness. There is evidence that Taylor had threatened to kill appellant, and that this threat had been communicated to appellant. There was also testimony to the effect that Massey when in a fit of anger was a very dangerous man. A number of witnesses qualified to testify as to the general reputation of the deceased in the community in which he lived for being a quarrelsome, violent, turbulent, and dangerous man, and that such reputation was bad. A number of witnesses testified as to the general reputation of the appellant, W. C. Massey, in the community in which he lived for being a quiet, peaceable, and law-abiding citizen, and that such reputation was good.

The only eyewitness as to what transpired upon the fatal occasion was the defendant, W. C. Massey. Massey testified in substance: That he was 49 years old,

and had a family consisting of himself and wife and 4 children. That he had been for some years in the stock business, and that he was in very bad financial condition. That Jim Taylor, the deceased, and Mrs. Taylor had persuaded him to permit their cattle to be brought to defendant's ranch, upon the assurance that arrangements would be made shortly to take them to another place. That Jim Taylor had taken possession of four calves belonging to defendant, and that he (the defendant) took two of the calves, and put them back with their mothers. That at that time and place Jim Taylor said that any time defendant put him to any trouble or notified the authorities about what he did "he would never ask me what I done it for, he would kill me." That about the 1st of February, 1924, he (the defendant) was preparing breakfast about 6 o'clock a. m., and Jim Taylor came into the room and said:

"You have been pouring it on to me. I says, 'Jim, what do you mean?' He says, 'You have been going on about the horses I ride; you talk about me riding your horses.' I says, 'I never said anything to you about riding any of my horses; you can ride them.' He says, 'You are God damn right I will,' he says, 'You are the God-damnedest son of a bicth I ever saw.' "

That at that time and place, after passing around the defendant, Jim Taylor continued:

"I have killed three men. When I killed Allen, when he was astruggling, dying, I walked up and put my foot on his arm, and told him to roll over, you damn son of a bitch, and die like a man. I will do anybody that way; it don't make any difference who they are. I would just as soon shoot a man in the back as in the belly; don't make no difference. I shot a Mexican in the back up here in the Salt river, and they don't know where he is yet. I love to kill men to see them kick anyway."

That at that time and place Jim Taylor cursed and abused him further ,and run all the cartridges through his six shooter to see if it was in good shape. That the defendant never said anything, but remained silent. That about 10 days thereafter, in the ranchhouse of the Massey ranch, Jim Taylor was talking with defendant concerning dogs and cats that had been poisoned out on the ranch, and, after indicating that he (Jim Taylor)

believed that the defendant had destroyed his dog and cat, said:

"Any time I can find out that anybody poisoned one of my dogs, he will die just like the dog did."

That thereafter, on Monday, March 23, 1925, the defendant left his house at Roswell, and went out to his ranch. That about 4 o'clock Cecil Massey and Jim Taylor came to the ranchhouse. That Cecil Massey was in the house with appellant when Jim Taylor came to the ranch and put his horse in the lot. That Jim Taylor came to the house where the defendants were. That at that time W. C. Massey gave to Jim Taylor a letter which Taylor's wife had written the day before (in this letter Mrs. Taylor stated she was glad that Taylor and Massey had made up their differences, and also told about some of the domestic and family affairs at home, and that she had been struck by a car.) That after reading the letter Jim Taylor said:

"The God damn son of a bitch never said who run over her with a car. I wish she had broke her God damn neck."

This testimony was excluded by the court, and will be further referred to hereafter. The deceased then said:

"You God damn white-collared sons of bitches, the undertakers won't know who to come and get when they come and get you."

And:

"Your God damn bellies will look like a pepper box when I get through with you."

And, referring to defendant's family, said:

"Them God damn white-collared high society woman folks of yours, I will put them in the washtub."

Then, speaking to Cecil Massey, son of the defendant:

"You God damn long-headed son of a bitch, I will shoot you like I would a dog."

That Cecil Massey replied:

"Jim, what have I ever did to you"

That at that time and place the deceased repeatedly pulled his gun from his pocket and put it back and pulled it out and put it back. That defendant W. C. Massey slipped by Jim Taylor, and went into another room, and picked up a Winchester, and wrapped it up in a wagon sheet, and carried it to defendant's automobile, and said:

"Come, Cecil, let's go. Let's go now, right now."

That at that time Jim Taylor got between him and the door, and would not let him pass for a while. That the car to which the defendant had gone was about 30 feet from the house. That Jim Taylor then came out of the house through the gate near the car, and passed where the defendant was sitting in the car. That Taylor cursed him again as he passed the car. Then Taylor went on to the lot, which was about 30 or 40 steps away, and passed through the gate, and was rubbing his horse.

That the defendant called to his son:--

"Come, Cecil, let's go as quick as we can."

That at that time this defendant had gotten out of the car, and was standing by the side of the car. That there was a trough about 16 feet long and 2 feet wide just in front of the lot gate through which Taylor had just gone. That, when this defendant had said, 'Come, Cecil, let's go as quick as we can,'' Jim Taylor whirled, and came back through the lot gate, and was coming around the trough with his hand back of his right side where this defendant had seen his gun a few seconds before. That as Jim Taylor came toward the defendant he said.

"You God damn son of a bitch, you will never get away from me alive."

That at this time the defendant took the rifle he had placed in the bottom of the Ford car and shot Taylor as quickly as he could. That when he shot Taylor he (Taylor) was passing around, or had passed around, the end of the feed trough near the lot gate through which he had just come. That Taylor was coming in a stooping position with his right hand on his pistol. That

Jim Taylor fell forward on his face, and turned over to the left on his back. That at that time he (the defendant) knew his life was in immediate danger; that the next day he and his son Cecil Massey took a turkey gobbler to the home of Jim Taylor; and that he did this because he did not want those boys coming to his house, as he was afraid they would kill him.

Defendant denied that he had said to Cecil at any time that they were going to have to kill Taylor, or he would get them in trouble about the hides; that he did not go to the sheriff's office and report the killing of Jim Taylor or tell any one about it because he had never been in any trouble before, and he did not know what to do, and was afraid; that he was afraid of Jim Taylor's boys and brothers and his wife.

There was testimony by witnesses for the state to the effect that the bullet which had killed Taylor went through the aorta, shattered the backbone and spinal cord, and was of such a character as to produce complete paralysis from the hips down, and opinion evidence to the effect that Taylor could not have rolled over after being so wounded, and also to the effect that, if he had fallen forward, blood would have flowed from the wound in the chest, and that there was no evidence of such flow.

Other evidence will be discussed in connection with the errors assigned and relied upon by the appellant.

[1] 1. Appellant complains that the court erred in permitting testimony to be introduced over the objection of the defendant and to his prejudice pertaining to other crimes than the crime with which the defendants were charged. This has reference to certain testimony tending to show that the defendants had unlawfully disposed of mortgaged cattle and unlawfully branded the offspring of certain mares which were mortgaged. In this connection the state also introduced testimony to the effect that appellant and his codefendant, upon discovery that the deceased had been riding around the ranch with representatives of the

mortgagee pointing out heads and paunches of slaughtered animals, had gone into a room and locked the door and engaged in a whispered conversation, in which the appellant said to his son that he guessed they would have to kill Jim Taylor before they got him away, or he would get them in trouble about the hides, or words to that effect. The state also introduced testimony of the wife of the deceased to the effect that appellant was apprehensive that he was going to be indicted on account of the slaughter and otherwise improper disposal of mortgaged animals, and was eagerly concerned as to whether or not Jim Taylor would stand by him, and said:

"They are going to try to get a bill against me, and I am 55 years old and broke. * * *They will send me off if there ain't something done, if Jim don't stay with me."

The court let in this testimony on the theory that it tended to show a motive for the crime of which defendant was accused.

"Any evidence that tends to show that the defendant had a motive for killing the deceased is always relevant as rendering more probable the inference that he did kill him." Underhill's Crim. Ev. (3d Ed.) § 503.

When viewed in the light of other testimony offered by the state and the circumstance that defendant had not, until after the testimony was received, admitted the killing, we think the testimony objected to was properly admitted.

[2] 2. Appellant next complains of the action of the court in excluding the testimony of the defendant concerning what deceased said after reading the letter which Massey had brought to him from his wife. The defendant was detailing the incidents immediately prior to and leading up to the homicide:

".Q Did he take the letter? A. Yes, sir.

"Q. Did he read it? A. Yes, sir.

"Q. What did he do at the time he read the letter? A. He looked at the letter, read it, and, after he got through reading the letter, I suppose he was through reading it, he says, 'The God damn son of a bitch never said who run over

her with a car. I wish she had broke her God damn neck.'

"Mr. Wyatt: We object to that, and ask that it be stricken.

"The Court: Mr. Osborn, can't you prevent your witness putting in such stuff as this?

"Witness: That is exactly the words he stated.

"The Court: I know, but that is not evidence in the case. Gentlemen of the jury, you are not to consider that as evidence in the case at all. What the deceased said about some third person is not material in this case.

"Mr. Osborn: I would like the privilege, your honor, just a minute—

"The Court: I will just make this statement: Confine your testimony to matters between the defendant and the deceased, not what the deceased said about third persons.

"Mr. Osborn: It will be limited to the defendant himself, or things that was said about the defendant's family?

"Mr. McClure: Is the other taken from the jury?

"The Court: Yes.

"Mr. McClure: We note an exception for the reason this testimony is part of the res gestae."

It is very earnestly argued by appellant that this declaration of the deceased concerning his wife was admissible as a part of the res gestae. It has often been said that the doctrine of res gestae is one difficult of application. It is not every statement or declaration even of the parties which is admissible in evidence because a part of the res gestae. While circumstances immediately or shortly preceding the homicide are competent as part of the res gestae, nevertheless what facts may be shown under this rule depends upon their nature and connection with the fatal act and the other circumstances determining their relevancy. See 11 Encyc. of Evidence, pp. 405, 406.

"All the relevant and material circumstances and particulars thereof may be shown." 6 Encyc. of Evidence, p. 611.

"The idea of res gestae presupposes a main fact or principal transaction, and the res gestae mean the circumstances facts, and declarations which grow out of the main fact, are contemporaneous with it, and serve to illustrate its

character. In Stephen's Digest we find the rule crystallized in these words: 'Whenever any act may be proved, statements accompanying and explaining that act made by or to the person doing it may be proved if they are necessary to understand it.' * * * * Thus, conversations contemporaneous with the facts in controversy and explaining such facts are admissible. It is not a condition of the admission of such evidence that no other can be obtained. The declarations are admitted when they appear to have been made under the immediate influence of some principal transaction, relevant to the issue, and are so connected with it as to characterize or explain it." 2 Jones, Comm. on Ev., vol. 2, § 344.

It is noted that immediately following the exclusion of this evidence counsel for defendants were permitted to show the language used by the deceased toward the defendant or any member of his family. The district attorney objected, and the court inquired of defendant's counsel:

"What light, except what was said to him, what light would it throw on this case if it was said to any other person or about any other person?"

Counsel for defendant replied:

"If he vented his vile language upon members of this defendant's family, that would be calculated to create a state of excitement on the part of this defendant and show the state of feeling of the deceased at the time he made it, and it is part of the res gestae."

The court then permitted that line of questioning. However, no effort was made by counsel for defendant to show to the court the relevancy or materiality of the evidence excluded. As we see it, the main fact sought to be established by the defendant was the hostile attitude of the deceased toward him as shown by threats to take his life or do him great bodily harm as subsequently followed by a demonstration of an intention to carry such threats into execution. We are unable to see how the language of the deceased toward his wife, although profane and violent, would characterize or explain the subsequent act of the deceased or of the defendant. We find no error with respect to the admission of this testimony.

3. Appellant complains of the action of the court in excluding the following testimony of the appellant.

The defendant was being interrogated concerning threats made by deceased against him prior to the day of the homicide, and testified:

"He told me if anybody done him any harm, or bumped h'm off or anything, that his boys' and his brothers would ki l them, and his wife was just as bad."

This was objected to as not being responsive to the question and as not being a threat by the deceased, and the court withdrew the answer of the witness from the consideration of the jury on the theory that it was not a threat by the deceased. We see no error in the ruling of the trial court in this respect.

Appellant sought to introduce testimony of a witness that he had a conversation about 2 weeks before the homicide; that the deceased told him he was never going to get off of the Massey ranch; and that witness told Taylor that he (Taylor) and Massey were both broke; and that they had better settle their differences; and have no trouble; and that the witness told Massey the same thing. The court denied the tender because it tendered hearsay, and because it related to a collateral matter which could not be litigated in the case on trial.

We see no fault with the ruling.

[3, 4]    4. We shall consider appellant's assignments of error Nos. 4 and 13 together. Kirk Johnson, a deputy sheriff, witness for the state, testified concerning a conversation between him and a woman in the residence of appellant, Massey, after the homicide, which conversation was not shown to have been in the presence of the defendant. The portion of the record involved in these assignments is as follows:

"Q. Just tell the jury what you did when you got up there. A. Mr. Zumwalt didn't know where Mr. Massey lived, and it just happened that I knew the place, and he asked me to go with him, so we drove on there, and drove in a little driveway into the house, between the houses up there, on north hill and it happened I was outside and next to the house, and Jodie said: 'You can get out and see if Mr. Massey is there, and see if he wants to go out with us tonight.' And I knocked two or three times, and finally a woman's voice answered, and wanted to know who it was, and I told her it was L. L. Johnson, and that I wanted to

know if Mr. Massey was there, and she said, 'No, he is not here.' I asked where he was, and she said: 'He went to the ranch this morning,' and I made the remark, 'You say he went to the ranch this morning?' Then she waited, whoever it was talking, and waited just a brief time, and says: 'No, he didn't go to the ranch; he went to the mountains.' And I says: 'When will be be back?' And she says: 'I don't know.' Then I called to Jodie, and asked him if there was any other questions he wanted to ask, and he said there wasn't.

"Mr. McClure:   Move to strike that and object to it because it has not been shown this was in the presence of the defendant, and is hearsay.

"The Court:   It is left for the jury to determine whether it was or not.   Overrule the objection.

"Mr. McClure:   Exception.

"A.   (Continued).   So I just came and got in the car, and we came on to town.   Then we left after that, then we went out to the Massey ranch.

"A.   Whom did you see after you got there?   A.   No one at all.

"Q.   And you say you found no one?   A.   I saw no one.

"Q.   Well, whom did you find, if any one?   A.   I don't know.   It was just a lady's voice talking from the inside of the house.   I don't know who she was.

"Q.   Did you hear any other voice than this lady's voice? A.   No, sir.

"Q.   And, so far as you know, there was no one present except this lady?   A.   All I know is the one voice I heard speak from the inside of the house.

"Mr. McClure:   We renew our motion in behalf of both of the defendants to strike this testimony from the jury, for the reason it is hearsay, and not in the presence of the defendants or either of them.

"The Court:   Overruled.

"Mr. McClure:   Exception."

There are several reasons why the judgment of the trial court could not be reversed on account of any error in this regard, if, indeed, it was error.   In the first place, no timely objection was made to the testimony.

"As a general rule, an objection to the admission of evidence must have been taken at the time the evidence was offered or introduced, or it will be deemed waived and will not be considered on appeal.   It should always be made at the earliest opportuntiy after the objection becomes appar-

ent. If apparent when offered, either by question to the witness or otherwise, it should be made then. If the evidence, apparently admissible when offered, is shown by subsequent developments to be exceptionable, the objection should then be made in the form of a motion to strike out, or by a request for an instruction that its effect be l'mited, or that it be withdrawn from the consideration of the jury." 3. C. J. Appeal and Error, § 731.

It is the theory of appellant that it was incumbent upon the state to prove that the statements here complained of were made in the presence of the defendant before the statements could become admissible. The objection that the statements were not made in the presence of the defendant would have been apparent several questions and answers prior to the time the motion to strike out and objections were made. We have held that, where no objection is made to the introduction of testimony, it is within the discretion of the court to sustain or refuse a motion to strike the alleged objectionable testimony. It is not clear from the record whether the court exercised his discretion to refuse to strike or treated the matter as though a timely objection had been made. Attempting to analyze the language of the court in making his ruling, we find that it is susceptible of the construction that it would be for the jury to determine whether the statement was made in the presence of the defendant after all of the evidence was in. If the state had afterwards adduced testimony that the defendant was present at the time, the statement would not be objectionable. We do not discover any further evidence on behalf of the state as to the presence of the defendant, although a daughter of appellant, testifying in his behalf, said that, when the witness Johnson came to her father's house upon the occasion heretofore narrated, and during the conversation, she was alone, and her father, the appellant, was not there at the time. However, we discover no subsequent effort of the appellant to renew their motion to strike the alleged objectionable testimony.

In State v. Orfanakis, 22 N. M. 107, 157 P. 674, complaint was made of the refusal of the trial court to strike certain portions of the testimony of a witness

who testified concerning a conversation between him-
self and one of the defendants jointly indicted with the
appellant, which occurred on the night of the homicide,
and which was not held in the presence of the appellant.
After the entire conversation referred to had been de-
tailed by the witness, a motion was made by counsel
for defendant that the testimony be stricken out.
Whereupon the district attorney suggested that the
state had a right to prove a conspiracy between the
three parties indicted. It would seem that the court
and counsel assumed that the testimony would be con-
nected up in order to show that a conspiracy existed.
No further objection was interposed by counsel for de-
fendant, and it was said that, if the state failed to prove
the conspiracy which it had suggested, it was incum-
bent upon the defendants to direct the attention of the
trial court to this fact, and renew his motion to strike
the objectionable testimony. We think the ruling in
that case is applicable in the case at bar, and we con-
clude, therefore, that the appellant is in no position to
urge his objection in this respect. Also it may be re-
membered that it is doubtful if any prejudice resulted
to the appellant from this testimony. State v. Holley,
136 S. C. 68, 134 S. E. 213, presents a similar situation.

The court there decided:

"Admission of testimony as to conversation with woman
in charge of defendant's home during his absence held not
prejudicial, where only reference to defendant was inquiry
as to whereabouts."

In the case at bar an inquiry was made as to the
whereabouts of the defendant, and his daughter stated
in the evidence objected to that he had gone to the
mountains, and it subsequently appeared in the testi-
mony of this daughter and also of the defendant that he
had gone to the mountains at the time in question

It is also objected that the language of the court in
overruling the objection to the declaration as not being
shown to be in the presence of the defendant that, "It
is left for the jury to determine whether it was or not,"
was improper, and a comment on the evidence. We do

not think it was necessarily a comment on the evidence, as what the court doubtless meant was that it was for the jury to determine from the evidence in the case whether or not the declaration was made in the presence of the defendant. In any event, we could not consider that objection which is now made for the first time; no exception having been taken to the language used by the court. The exception was taken to the ruling of the court on the objection.

As to the other alleged improper remark of the court in giving his reasons for admitting a part of a conversation, a portion of which had been brought out by the defense, we see no error therein, particularly in view of the fact that the court instructed the jury in the usual form that by nothing which the court had said in ruling on the evidence offered in the trial did the court express any opinion whatever as to any controverted fact in the case; all such facts being reserved to the jurors to determine.

5. On the state's rebuttal, the witness Will Roberts testified that he had known the defendant Massey for a good long time; had known him in Texas and also in New Mexico; had worked with him in Texas, and had seen him handle and shoot his Winchester. The witness was permitted to testify, over objection of the defendant, that defendant "could handle it pretty fast; pretty good;" that he knew Jim Taylor during his lifetime; had observed him handle his gun; had worked with Jim Taylor; had been with him a good deal on the ranch; had seen him draw and handle his pistol. Then the following question was propounded:

"Mr. Roberts, knowing about how the defendant W. C. Massey handled his gun, and knowing how Jim Taylor handled his pistol, I will ask you to state to the jury your opinion as to whether or not it would be possible for the defendant W. C. Massey to get his Winchester up to his shoulder and shoot Jim Taylor, if Jim Taylor had his hand on his pistol at the time W. C. Massey started to get his gun?"

The answer was:

"No, sir: I don't believe he could do it."

The objection was as follows:

"Mr. McClure: We object to that as immaterial, incompetent, and irrelevant, no proper foundation laid for its introduction, which renders it incompetent, and for the further reason that it is not rebuttal testimony, and does not tend to contradict any evidence offered by the defendants or either of them, as to ——— during the trial of this case, and for the further reason that the answer could be no more than a guess, unless it was based upon conditions, and that conditions would have very much to do with the determination of the hypothetical question propounded to the witness."

[5] The testimony would tend to rebut the narrative of the defendant, and upon the objection that it was not rebuttal testimony we find that the trial court was not in error. It is here argued that the evidence was also objectionable as being mere opinion evidence, and it is claimed that such objection was urged upon the trial court, and we are referred to the pages of the transcript containing the foregoing objection. We do not deem it necessary to go into a discussion of the so-called "opinion rule" of exclusion of testimony, because we are of the opinion that the objection was not sufficient to invoke a ruling by the trial court upon the question here argued that is, that the evidence was objectionable as being opinion evidence. Neither do we think that the question or the answer elicited was such an invasion of the defendant's rights that the trial court was required to notice it in the absence of specific objection. Objections not made in the trial court to a question propounded to a witness will not be considered on appeal. See James v. Hood, 19 N. M. 234, 142 P. 162.

[6] 6. Assignments of error Nos. 6, 7, 8, 11, and 14 all challenge the sufficiency of the evidence to support the verdict. With respect to this contention it is sufficient to say that we have carefully read the record, and find substantial evidence to support the verdict.

[7] 7. We will consider assignments of error Nos. 9 and 10 together. They relate to the refusal of the court to give appellant's requested instructions Nos. 2 and 3, which are as follows:

"(2)   You are instructed that the laws of the state of New Mexico do not make it incumbent upon the person who has killed an assailant in self-defense to give notice or inform any one of the fact, and if you find from the evidence in this case that the defendant ——— failed to give such notice or information, then I charge you that such conduct on his part raises no presumption of guilt, but you may in arriving at your verdict in this case consider such conduct on the part of the accused and his explanation thereof, if any, in connection with all other facts proved in the case in determining his guilt or innocence.

"(3)   You are instructed that, while you may consider the manner, demeanor, and interest, or want of interest, of any witness when testifying in this, I charge you that the laws of New Mexico make it the duty of every sheriff, deputy sheriff, constable, and every other peace officer to co-operate with and assist the district attorney in the investigation of all violations of the criminal laws of the state of New Mexico, and, if you find in this case that any witness has acted as such peace officer, and co-operated with and assisted the district attorney in investigating the facts of the case on trial, then it becomes your duty to scrutinize and weigh the testimony of such witness, and determine, if you can, whether or not the interest and service of such witness has influenced him to an extent which would affect his testimony, and then give his evidence such weight, and such weight only, as under all the facts proved you deem it entitled to receive."

While requested instruction No. 2 probably states the law, i. e., that there is no presumption of guilt from the silence of the appellant when he was under suspicion of having committed the crime, yet we deem the subject sufficiently covered by the instruction given by the court, and particularly the usual one concerning the presumption of innocence of the defendant, and that such presumption of innocence remains with him throughout the trial of the case, etc. Likewise as to the defendant's requested instruction No. 3. The court's instruction No. 25 advised the jury that they were the sole judges of the credibility of the witnesses and of the weight to be given to their testimony, and that in determining the credibility of the witnesses and of the weight to be given to their testimony, and that in determining the credibility of such witnesses, the jury should take into consideration their interest in the result of the case, their motive for testifying, etc. The sheriff had testified that he was interested in the case from the start, and was still interested. The law makes

it the official duty of every sheriff and other peace officers to investigate all violations of the criminal laws of the state. No duty is imposed upon such officers to file complaints, unless the circumstances are such as to indicate to a reasonably prudent person that such action should be taken, and they are required to co-operate with the prosecutors only in reasonable ways. We think the instruction given by the court opened the door wide enough for argument as to the interest which a peace officer co-operating with the district attorney's office might have in the outcome of the case, and that no error was committed by the court in refusing the requested instruction No. 3.

8. Assignment of error No. 12 relates to the overruling of the motion of defendant for a new trial. This assignment is not argued. The disposition of the other assignments substantially disposes of this point.

Counsel have shown great zeal and ability in presenting appellant's contentions. In many respects it is a close case; yet, after careful consideration, we find no error in the record, and the judgment is therefore affirmed, and it is so ordered.

PARKER, C. J., and WATSON, J., concur. ·