STATE OF IOWA, Appellee, v. CARL N. KNOX, Appellant.

No. 46509.

500

May 8, 1945.

Rehearing Denied June 25, 1945.

F. M. Beatty and Hamilton & Updegraff, all of Sigourney, for appellant.

John M. Rankin, Attorney General, Charles H. Scholz, Assistant Attorney General, Ralph H. Goeldner, County Attorney, and Leo D. Thoma, Special Assistant County Attorney, for appellee.

MANTZ, J.—Carl Knox, defendant, was indicted by the grand jury of Keokuk County, Iowa, on October 25, 1943, charged with the murder of his father, Walter Knox. Such indictment, omitting the formal parts, is as follows:

"The Grand Jurors of the County of Keokuk in the name and by the authority of the State of Iowa accuse Carl N. Knox of the crime of murder in the first degree and charge that the said Carl N. Knox in the County and State aforesaid did on or about the 21st day of July, A. D. 1943, in Sigourney, Iowa, willfully, deliberately, and premeditatedly kill one Walter Knox by means of poison, contrary to and in violation of section 12911 of the 1939 Code of Iowa."

Defendant's plea was not guilty. The jury found him guilty of first-degree murder, fixing life imprisonment as his punishment. The defendant has appealed.

I. Appellant in this appeal has urged many errors. Some relate to the refusal of the trial court to direct a verdict in his favor; the insufficiency of the evidence to sustain the verdict; the. admission and rejection of testimony; the giving of instructions and the refusal of the court to give others requested: and some others.

Before. taking up the errors urged we think it advisable to set forth a general outline of the history, circumstances, and facts appearing in the record as a background in order that there may be had a better understanding of the matters here on appeal.

The trial of the case lasted three weeks. Both sides were represented by able and experienced counsel. Many witnesses were examined, some of them being experts. There is in the record much medical testimony. The record is large. This is also true of the briefs and arguments filed in this court. These reveal care in their preparation and a wide and extensive study and investigation of the legal principles involved. We commend counsel for the manner in which this appeal has been presented.

The crime charged, if committed, was both gruesome and abhorrent: a son killing his father and using poison as a deadly instrumentality. That the father died from a deadly poison there can be little question. There is considerable evidence in the case indicating things sordid, depraved, and revolting. It contains much dealing with filial respect and devotion, or lack of it, from son to father. There is evidence tending to show studied neglect, abuse, and indifference of the father by the son; also claims of marital shortcomings, moral misdeeds, and crimes on the part of appellant.

Walter Knox was born and reared in Keokuk county. He worked on a farm and as a carpenter. In 1924, with his wife and son Carl, then eleven years old, he went to California. In 1928 the wife divorced him, Carl staying with his mother. In 1930 Walter returned to Keokuk county and lived on a forty-acre farm near Delta until 1934, when he returned to California. He again returned to Iowa in 1935, and within a few days had a stroke, paralyzing his left side permanently. From this he never recovered. For a time he was in a hospital at Oskaloosa and later for a time was kept in private homes. Walter requested Carl to return and care for him. Carl and a bride, June, came soon thereafter and moved to the small house near Delta. At that time it was a two-room structure but later another room was added. Walter was given medical treatment for a time but this was discontinued upon advice that it was of little help. June returned to California in the fall of 1935 and there is no further mention of her in the record. Carl had a wheel chair fixed up and in it Walter could push himself about the house. He had to be assisted in most respects. At that time

Walter owned the forty-acre tract, worth about $2,000, and also $3,400 in cash and loans. As time passed, the father became morose and irritable and at times difficult to handle. Doubtless this arose, at least in part, from his physical condition.

After Carl came to Delta he lived with his father until the father died. He managed the farm and gave personal attention to the wants of his father. At times he hired others to care for his father and this was particularly true when he was away. He cooked the meals, attended to his personal wants, and kept him supplied with things needed. At times the house was clean, and at times otherwise. Due to the inability of the father to get about, a bucket was used as an indoor toilet. Sometimes, because of accumulations, this gave off an offensive odor. His bed and person were unclean and filthy at times. At times he resented attempts to get him cleaned up.

In 1939 Carl took on outside work in buying and handling livestock. In March 1940, he married Mary Fear, daughter of Dr. Fear, of Delta. To this union two children were born. She came to the farm home at times but did not seem to get along with the father. Following the birth of the last child she and the children lived with her father. Carl would see them at times. They lived apart but were not divorced. In 1940 Carl and a cousin, Earl Noller, entered into the livestock business at Sigourney and for a time Carl drove back and forth to the farm. About November 1942, Carl and his father moved to Sigourney and rented a small four-room house close to the stockyards and but a short distance from its office. The house was cleaned, papered, and painted, and had much new furniture therein. At the request of the father, Carl purchased from Sears Roebuck, shortly before moving to Delta, an indoor toilet for the use of his father. With this toilet there came a can of disinfectant to be used in disinfecting it. This disinfectant was a caustic and was poison. It was kept in the bedroom of the father. Here Walter and Carl lived together until the father's death on July 21, 1943. Carl's wife, Mary, a sufferer from a cancer for many years, died on August 11, 1943. On January 30, 1943, Walter, for a consideration of $1 and love and affection, conveyed the forty-acre tract to Carl, who, on April 7, 1943, resold

it to one Graham, receiving as a purchase price the sum of $2,000. A few days after the death of his father, as a result of an investigation made by state and county officials, Carl was arrested, charged with the murder of his father, and upon conviction appealed to this court.

The State claims that appellant murdered his father by the use of the poisoned antiseptic caustic; the appellant denies this and claims that the death was self-inflicted—in other words, suicide. We quote from the brief of appellee:

"It is the State's theory that this chemical when mixed with water, has a color like milk, and that the defendant got his father to take some of this chemical into the mouth and stomach believing that he was drinking milk, milk being his principal item of diet. That upon the taking of some of this chemical in this manner, the natural reflex, because of the extreme burning sensation, was to expel it. Walter Knox fought back against Carl and in the process the glass contents were spilled; that Carl then beat and struck his father rendering him at least unconscious to the extent, of enabling Carl to pour some of this fluid undiluted into the mouth of Walter Knox."

There was no direct evidence to support such theory. Carl contradicted it in positive terms. If such theory was borne out, it necessarily had to be established by circumstantial evidence.

II. The first matter to be considered relates to the sufficiency of the evidence to support the indictment. Appellant argues that the verdict is contrary to the evidence. Before entering into an analysis of the evidence we will call attention to a few of the legal principles. In this class of cases, where the claim is made that the evidence does not sustain the verdict, we find that our courts have spoken thereon many times and the legal principles governing are quite well settled. The difficulty lies in the application.

We have held that this court will not interfere with the verdict of the jury where there is supporting such verdict substantial testimony. State v. Harrington, 220 Iowa 1116, 264 N. W. 24; State v. Crandall, 227 Iowa 311, 288 N. W. 85; State v. Cummings. 128 Iowa 522, 105 N. W. 57; State v. Richardson,

179 Iowa 770, 162 N. W. 28, L. R. A. 1917D, 944. It has like-wise been frequently held by this court that where the verdict is clearly against the weight of the evidence a new trial will be granted. State v. Wise, 83 Iowa 596, 50 N. W. 59; State v. Rein-heimer, 109 Iowa 624, 80 N. W. 669; State v. Carson, 185 Iowa 568, 170 N. W. 781; State v. Klein, 218 Iowa 1060, 256 N. W. 741.

The evidence offered by the State covers a wide range. The record is voluminous. We have gone over it with care and in so doing have made use of the original transcript. It would serve no useful purpose to set it out in detail. The evidence is almost all of a circumstantial nature. Much of the evidence of the State deals with the relationship and associations existing between Carl and his father, and particularly with the period following the stroke of the father in 1935, including his death on July 21, 1943, and Carl's arrest and confinement a few days later. It covers a period in excess of fifteen years. It deals with the property of the father; the transfer of it to Carl in January 1943, without consideration; the transfer of the land by Carl a month or two thereafter; the efforts of Carl to place his father in the county home; the abuse of the father by Carl; the son's neglect and failure to take proper care of his father, and ref-erence to his father in vile and profane terms; the locking of the father in the house and leaving him alone for considerable periods of time; the death of the father on July 21, 1943; the failure of Carl to call a physician; his actions about the house following the death of his father, and in failing to call the undertaker for at least seven hours following the death; the various wounds and bruises found on the head and body of the father; Carl's evasive and contradictory statements and suggestions to the undertaker and the officers as to what might or might not have caused the death; the burned and seared condition of the mouth, throat, and stomach, showing acid burns; the various claimed contradictory statements made by Carl following his being taken into custody; the opinion of compe-tent medical experts that the death did not come from suicide. These and other facts and circumstances appearing in the record we feel were sufficient to take the case to the jury, and following a careful analysis we are constrained to hold that the

verdict is not so lacking in the support of the evidence as to warrant this court in setting aside such verdict and the judgment rendered thereon.

III. Appellant further claims as error the asking of him of certain questions on cross-examination and the ruling of the court upon his objections thereto. The questions objected to dealt with claimed improper relations between appellant and Mary Fear before their marriage in March 1940. Before setting out the specific complaint we will call attention to some other matters which may throw some light on the claim which appellant makes in this particular matter. In written argument counsel for appellee has laid particular stress upon and called attention to the various relations of appellant with women. He called attention to the elopement of appellant with June, his first wife, early in 1935; to his marriage to Mary Fear in March 1940, and the birth of their first child in August 1940; and following that, and up to the time his father died, and while his wife was living, his infatuation for Eva Garrels; their illicit relations, culminating in her pregnancy and in his procuring an abortion and paying therefor; their later becoming engaged; his gifts to her of a $280 diamond ring, clothing, dishes, and a riding horse.

In argument appellee made the following statement:

"A review of this record will show the weakness of Carl Knox for women. It is a matter of common knowledge and common experience that many crimes are committed because of the desire of a man for a woman."

Following this appellee argued somewhat at length that a man with such a weakness might be more likely to commit a crime in order to satisfy such weakness. We think it but fair and reasonable to assume that in presenting the State's case to the jury counsel emphasized this alleged weakness in a forceful manner.

We will set out part of the record showing the proceedings against which specific complaint is lodged. On direct examination appellant testified that he married Mary Fear, a daughter of Dr. Fear of Delta, in 1940, and that to this union two

children, a boy and a girl, were born. He was married to Mary nearly three and one-half years prior to the date of the alleged crime. On cross-examination he was asked:

"Well you had had some improper relations with Mary Fear before you and she were married, had you not? [Defendant objects as incompetent, irrelevant, and immaterial, not proper cross examination. Objection sustained. State excepts.]" The next question is as follows: "Q. You told the officers since you were arrested that you had had some improper relations with Mary Fear before you and she were married, did you not? [Defendant objects as incompetent, irrelevant, and immaterial, objects to the question as being improper conduct, being ruled upon. Objection overruled. Defendant excepts.] A. That is right."

It is the claim of appellant that the two questions propounded and set out above were not only irrelevant and not proper cross-examination but were improper and highly prejudicial to him and his rights. Appellant was testifying in his own behalf. This was his right. However, by statute, section 13892, Code, 1939, his cross-examination should have been confined strictly to the matters testified to in chief. This court has held that the cross-examination of a defendant in a criminal case shall be strictly confined to matters of impeachment, not permitting thereby to inject prejudicial matter into the record. State v. Concord, 172 Iowa 467, 154 N. W. 763; State v. Thompson, 127 Iowa 440, 103 N. W. 377; State v. Burris, 194 Iowa 628, 190 N. W. 38; Buel v. State, 104 Wis. 132, 80 N. W. 78; State v. Dillman, 183 Iowa 1147, 168 N. W. 204.

State v. Thompson, supra, 127 Iowa 440, 442, 103 N. W. 377, 378, was a case where defendant was charged with assault with intent to commit murder. He testified in his own behalf. In his direct examination he gave his version of the transaction under investigation. He was asked on cross-examination: "You never struck your sister in Pearl's presence, did you, and knock her down?" An objection that the question was not cross-examination and was immaterial was overruled and on appeal this was held error, this court saying:

"It should have been sustained, and the prosecutor directed not to drag irrelevant matter into the record."

The case of State v. Burris, supra, 194 Iowa 628, 635, 636, 190 N. W. 38, 41, was a murder trial. The opinion in that case was by Faville, J. On appeal by defendant following conviction it was claimed that certain questions propounded to the defendant on cross-examination were improper and prejudicial. The questions related to improper conduct between the defendant (colored) and some white girls. "During the time you worked for J. G. Sax, did you take some white girls out riding in J. G. Sax's car?" Proper objection was made and overruled. Other questions along the same general line were asked and over proper objections answers were required. This court held the rulings constituted error. In doing so, this court used the following language:

"No one can reasonably doubt that this cross-examination of the appellant by the prosecutor, under the facts of this case, was highly prejudicial to the appellant. In ruling upon the objections to the evidence, the lower court indicated that the examination was proper, as affecting the credibility of the witness. These questions were clearly not proper cross-examination, and can be defended solely on the ground that, when appellant tendered himself as a witness in his own behalf, it opened up to the prosecutor the right to interrogate him in regard to any actual or assumed misconduct on his part of which he might or might not have been previously guilty, for the purpose of testing his credibility.

"Code section 5485 is as follows: 'When the defendant testifies in his own behalf, he shall be subject to cross-examination as an ordinary witness, but the State shall be strictly confined therein to the matters testified to in the examination in chief.'

"We have held that, when a defendant in a criminal case testifies in his own behalf, he stands upon the same footing as any other witness, for cross-examination with relation to his memory, motives, history, or matters affecting his credibility. State v. O'Brien, 81 Iowa 93; State v. Watson, 102 Iowa 651,

654; State v. Chingren, 105 Iowa 169, 172; State v. Kuhn. 117 Iowa 216; State v. Brandenberger, 151 Iowa 197; State v. Peirce, 178 Iowa 417; State v. Brooks, 181 Iowa 874; State v. Brennan, 185 Iowa 73.''

Code section 5485 [Code, 1897] is identical with our present Code section 13892. In the case above quoted from it was held that the examination necessarily rested largely within the sound discretion of the trial-court. In holding that there was an abuse of discretion on the part of the trial court, this court said:

''We think it was an abuse of the discretion lodged in the trial court to permit this examination to be conducted to the extent that it was, and that it was necessarily prejudicial to appellant. It was an attempt on the part of the State to drag into the case, by insinuation and suggestion, matters that were collateral and irrelevant, for the obvious purpose of prejudicing the appellant in the eyes of the jury. Such methods to secure the conviction of one charged with crime do not comport with the spirit of fairness which has always been one of the most cherished tenets of our administration of criminal law.''

The court in the Burris case quoted from Buel v. State, supra, 104 Wis. 132, 146, 80 N. W. 78, 83, as follows:

'' 'It is one thing to honestly ask questions on cross-examination for the purpose of discrediting a witness, and quite another to ask questions of a witness who is a party, especially in a serious criminal case, for the purpose of injuring his cause in the eyes of the jury, and leading them to believe he was likely, because of his bad character, to have committed the offense charged.' ''

In the case of State v. Concord, supra, 172 Iowa 467, 475, 154 N. W. 763, 765, speaking of limits in cross-examination of a defendant in a criminal case, this court said:

''Of course he [defendant] is subject to impeachment as any other witness; but the state, in conducting the cross-examination, should be confined strictly to matters of impeachment

and not, under cover thereof, be permitted to inject prejudicial matter.''

The two questions asked were in no sense impeaching. Certainly neither affected the appellant's credibility. Both were irrelevant in that they had no probative value in fixing a crime of murder claimed to have been committed nearly three and a half years after the claimed improper relations between appellant and Mary Fear. We think that such questions had the effect of injecting into the case, by insinuation and suggestion, collateral and irrelevant matters, advising the jury the kind of man appellant was; in other words, permitting and inviting them to consider and pass judgment, at least in part, upon incidents of his past life and years removed from the time of the crime charged. State v. Flory, 198 Iowa 75, 199 N. W. 303; State v. Williams, 195 Iowa 785, 192 N. W. 901; State v. Brazzell, 168 Iowa 480, 150 N. W. 683.

We hold that both questions were improper and highly prejudicial, calling for irrelevant evidence; not proper cross-examination; and that the court abused its discretion in permitting them.

IV. The errors next urged and considered deal with related matters: the admissibility of the testimony of witnesses Tremmel. Banes, and Murray; the court's overruling of appellant's motion to strike the testimony relating to appellant's attitude toward his wife and his conduct with Eva Garrels, and to grant a new trial and set aside the verdict; and his exceptions to instructions. The particular complaint of appellant is that certain witnesses were permitted to testify as to statements made to them by appellant while in custody.

Appellant states in his brief that such claimed errors present closely related propositions of law and fact and argues all of them in one division. We think that such claimed errors may be considered together. The matters here discussed have some relationship to the discussion in Division III herein, where we dealt with the propounding to appellant of certain questions on cross-examination relative to claimed improper re-

lations had by him with Mary Fear prior to their marriage in 1940. The conclusions there reached and the authorities cited we think have some application here. There he was being interrogated as to claimed improper relations with Mary Fear. Most of the discussion under this head deals with claimed unlawful and illegal relations between appellant and Eva Garrels, as well as improper conduct between them.

A brief statement as to the events leading up to the claimed statements and admissions of appellant concerning his relations with Eva Garrels may be helpful to a better understanding of the claimed errors. All of these witnesses were officers. Tremmel was sheriff of Keokuk county; Banes was his deputy; Murray and Kerns were state agents and were assisting the sheriff. Walter Knox died on July 21, 1943. Following his death, Carl went about his work at the stockyards until he was "picked up," without warrant, by the sheriff, on the evening of July 30, 1943, and was at once taken to the jail of Wapello county at Ottumwa, Iowa. He was kept in custody there until about 3:30 to 4 p. m. August 2d, when he was brought before a magistrate at Sigourney, where a charge was filed and he was placed in jail. During much of the time he was in the jail at Ottumwa he was being examined, first by one officer and then another, sometimes by more than one at the same time. If a record was made of the questioning it was not produced or offered in court, although there was some reference made to it. Appellant claims that he was questioned continuously and until he was exhausted. We have examined the record and do not think such claim has its full support, but we do think questioning over such a period might work in that direction. Throughout appellant maintained his innocence. The record shows that appellant was questioned as to his relations with Eva Garrels, his engagement with her, their sexual relations, and a procured abortion. The claimed admissions of appellant as to his relations with Eva Garrels were, in effect, that they had committed two crimes—adultery and abortion—in addition to various acts of misconduct. According to the record appellant and Eva Garrels became acquainted in August 1942. She was then nineteen years of age. For some time after Carl brought his father to Sigourney, Eva Garrels

worked for him, doing the cooking and usual housework. She and Walter Knox apparently were on friendly terms at all times.

Sheriff Tremmel was a witness for the State and part of his direct examination is as follows:

"Q. During that conversation did you have any talk or make any inquiries in reference to his relations with this girl, Eva Garrels? [Defendant objects as irrelevant and immaterial to any issue in this case.] Mr. Thoma: As to the motive. [Objection overruled. Defendant excepts.] Q. Just relate what Carl told you in that respect? [Same objection. Same record. Defendant excepts.] A. Carl told me that he started going with Eva Garrels in August, 1942—that during the acquaintance and since their acquaintance she had stayed at his house, at his father's home in Sigourney about thirty (30) nights. During that course of time he had intercourse with her. Along in December of 1942 he learned he had her in the family way. [Defendant objects to any further testimony in this line as incompetent and immaterial. Objection overruled. Defendant excepts.] A. He and Eva talked the matter over and decided to go to a doctor and have an abortion, which they did and after the doctor's treatment he and Eva came to the home of his father, to his father's home and she stayed there two days until she aborted."

State Agent Murray and Deputy Sheriff Banes each testified to substantially the same facts as Sheriff Tremmel as to the claimed statements and admissions of appellant in regard to his improper relations with Eva Garrels, her consequent pregnancy, the procured abortion, and their subsequent engagement, the various gifts to her, and their plans to marry. Banes testified that he asked Carl if he did not feel ashamed to have an affair of this kind when his wife was home ill with a cancer, and that appellant replied that he had no regrets, that he never loved his wife, and that they never had got along. Also that appellant said that he paid the cost of the abortion, $50.

All of this testimony was objected to by appellant as incompetent, immaterial, and irrelevant matter, and introduced into the case distinct and separate events, and was prejudicial to the

defendant. Such objection was overruled and appellant excepted. Later appellant moved to strike from the record all of the evidence given by Tremmel, Murray, and Banes as to the statements appellant made concerning his relations with Eva Garrels and those with his wife. This motion was likewise overruled.

The record above set forth speaks very forcibly and it is not difficult to understand the particular reasons for the introduction of the evidence objected to. Proper objections were made to it at all points. Appellee urged then, as now, that such evidence went to show motive. If true, the statements of appellant showed the commission of two independent crimes months before the death of the father. How possibly could there arise any inference that, because appellant debauched Eva Garrels at least seven months before, and procured an abortion to relieve her from pregnancy, he therefore killed his father? If relevant at all, it must be because, having committed adultery, followed by an abortion, he then became possessed of a motive which but for those things did not exist, which might prompt him to desire to murder his father. This evidence came out in appellee's case in chief. At that point the character of the appellant was not in issue. The evidence did not come out "incidentally," such as in some connection with some other matter, but came out directly and was not in response to any claim made by appellant.

Appellee offered the testimony of officers Tremmel, Banes, and Murray to show what appellant admitted to them as to his relations with Eva Garrels, and his attitude toward his wife, to show motive. Nothing further was claimed for it. The trial court in its instructions told the jury that it might consider such evidence on the question of motive and for no other purpose.

Eva Garrels was a witness for appellee. She told of first meeting appellant in August 1942; of later working for him and his father at Sigourney, and of becoming engaged to Carl in April or May 1943. No questions were propounded to her as to her relations with Carl. If there were unlawful relations between Carl and Eva they must have first taken place in 1942,

as the appellee claims that Eva had an abortion performed in Ottumwa in 1942.

We are unable to see wherein the unlawful and immoral relations in 1942, if true, would show any motive for an entirely separate, independent, and different crime—the murder of the father on July 21, 1943. Had Carl been accused of the murder of his wife, Mary, such evidence we think might show motive. His wife would stand as an obstacle to his marrying Eva. Nothing of the kind would be true of his father.

We hold that the court erred in admitting the testimony hereinbefore set forth. Its admission was prejudicial. In support of our holding we call attention to some of the legal principles involved and set forth in our decisions. Because of the gravity of the charge and the serious results following a conviction we feel justified in setting forth the principles at length.

It is to be kept in mind that not only did appellant object to the testimony admitted; later he moved to have same stricken and urged as error the refusal of the court to do so.

It hardly needs authority to sustain the proposition that evidence presented in a case must be relevant to the issue. If not relevant it has no place in the trial. What is meant by the term "relevant"? Let us turn to the authorities. In Black's Law Dictionary, Third Ed., 1522, it is said:

"Applying to the matter in question; affording something to the purpose." "Relevancy" is defined as: "Applicability to the issue joined. That quality of evidence which renders it properly applicable in determining the truth and falsity of the matters in issue * * *. See 1 Greenl. Ev. §49. Two facts are said to be relevant to each other when so related 'that according to the common course of events, one either taken by itself or in connection with other facts, proves or renders probable the past, present, or future existence or non-existence of the other.' "

By "relevancy" is meant the logical relation between the proposed evidence and a fact to be established. All facts are admissible in evidence which afford reasonable inferences or throw any light upon the matter contested. Detroit Iron &

Steel Co. v. Detroit Gray Iron Foundry Co., 240 Mich. 677, 216 N. W. 391; 10 R. C. L. 887.

" 'Logical relevancy' in evidence may be defined as the existence of such a relationship in logic between the fact of which evidence is offered and a fact in issue that the existence of the former renders probable or improbable the existence of the latter.'' 31 C. J. S. 864, section 158. See, also, Malone v. State, 16 Ala. App. 185, 76 So. 469.

This court, in discussing the matter of relevancy, in State v. McDougal, 193 Iowa 286, 296, 186 N. W. 929, 934, said:

"It has been held that one fact is relevant to another when, according to the common course of events, the existence of the one, taken alone or in connection with the other facts, renders the existence of the other certain or more probable. Locke v. Kraut, 85 Conn. 486, 489. An offer to prove a fact in evidence involves an assertion by him that such a relation exists, in reason, as a matter of logic, between the fact offered and a fact in issue, that the existence of the former renders more probable or improbable the existence of the latter; and the relation thus asserted is termed relevancy. It is, therefore, a basic rule of evidence that whatever facts are logically relevant are legally admissible.''

See, also, 22 C. J. 158, section 89; 31 C. J. S. 864, section 158; 16 C. J. 543, section 1034; 22 C. J. S. 918, section 600; Worez v. Des Moines City R. Co., 175 Iowa 1, 156 N. W. 867; State v. Lee, 91 Iowa 499, 60 N. W. 119; Wharton, Criminal Evidence, Eleventh Ed., 257; 2 Jones, Evidence, 1083; 3 Rice, Evidence, 69.

Taking the legal definitions of "relevancy" as a guide, let us see how they apply to the fact situation herein. Appellant was on trial for the murder of his father on July 21, 1943. The evidence on behalf of the State to show murder was circumstantial. To support the charge appellee offered evidence of other crimes said to have been committed by appellant. The claim was that these crimes showed motive. It is difficult to see wherein the crime of adultery or abortion committed over six months before the alleged murder had any relevancy to the one charged on

July 21, 1943. No relationship between the two has been set forth, none is apparent, and we think none exists. Certainly there is nothing in the record to show any connection between the adultery and abortion on the one hand and the alleged murder on the other.

We hold that the evidence as to the alleged crimes between appellant and Eva Garrels was not relevant and should have been excluded.

 Motive has been defined by the courts many times:

"In criminal law, it [motive] is that which leads or tempts the mind to indulge in a criminal act. It is an inferential fact, and may be inferred not merely from the attendant circumstances, but, in conjunction with these, from all previous occurrences, having reference to and connected with the commission of the offense. 8 R. C. L. 63. The cause or reason that induced a person to commit a crime." Ballentine's Law Dictionary, 837. See, also, 13 R. C. L. 746–761.

"Motive * * * is the impulse which moves a man to commit the criminal act. This impulse may arise from various causes, hatred, jealousy, avarice, etc. * * * But where the defendant denies the act, the question of motive becomes important. * * * Presence of motive tends toward guilt. Motives are usually hidden, and must be found by considering all circumstances and facts which tend to reveal their existence." State v. Hyde, 234 Mo. 200, 231, 237, 136 S. W. 316, 324, 326, Ann. Cas. 1912D, 191.

"The inducement, cause, or reason why a thing is done." Black's Law Dictionary, Third Ed., 1209. "A motive is some cause or reason that moves the will, and induces action." In re Eaves, 4 Cir., N. C., 30 F. 21, 26. "* * * Motive has been well enough described as 'that which leads or tempts the mind to indulge in a criminal act.' " Thompson v. United States, 1 Cir., Mass., 144 F. 14, 18, 75 C. C. A. 172, 7 Ann. Cas. 62. See, also, Kessler v. City of Indianapolis, 199 Ind. 420, 157 N. E. 547, 53 A. L. R. 1; People v. Weiss, 252 App. Div. 463, 300 N. Y. Supp. 249. "Motive, in murder, is the impulse or purpose that induces the murderer to kill his victim." State v. Hyde, 234 Mo. 200, 226, 136 S. W. 316, 322, Ann. Cas. 1912D, 191. See,

also, State v. Logan, 344 Mo. 351, 126 S. W. 2d 256, 122 A. L. R. 417. " 'Motive is the moving power which impels to action for a definite result.' " Williams v. State, 113 Neb. 606, 611, 204 N. W. 64, 66. See, also, Simmons v. State, 111 Neb. 644, 197 N. W. 398, certiorari denied, 268 U. S. 696, 45 S. Ct. 514, 69 L. Ed. 1162; Baker v. State, 120 Wis. 135, 97 N. W. 566; People ex rel. Hegeman v. Corrigan, 195 N. Y. 1, 87 N. E. 792; State v. Winters, 102 Vt. 36, 145 A. 413; Ball v. Commonwealth, 125 Ky. 601, 101 S. W. 956, 31 Ky. L. Rep. 188.

"While motive is not an element of a crime and proof thereof is not essential to sustain a conviction, it is of great probative force in determining guilt, especially in cases of circumstantial evidence." 22 C. J. S. 88, section 31.

See, also, State v. Hembree, 54 Or. 463, 103 P. 1008; State v. Lawrence, 196 N. C. 562, 146 S. E. 395; People v. Lewis, 275 N. Y. 33, 9 N. E. 2d 765; Simmons v. Fenton, 268 U. S. 696, 45 S. Ct. 514, 69 L. Ed. 1162; State v. Bass, 251 Mo. 107, 157 S. W. 782; State v. Close, 106 N. J. Law 321, 148 A. 764.

In this state, in the case of State v. Campbell, 213 Iowa 677, 683, 239 N. W. 715, 719, it was said:

"It is always competent to prove a motive for the commission of a crime, and evidence relative thereto is admissible as having more or less weight according to the other proved facts and circumstances with which it is related."

See, also, State v. Brazzell, 168 Iowa 480, 150 N. W. 683; State v. Kuhn, 117 Iowa 216, 90 N. W. 733; State v. Carlson, 203 Iowa 90, 212 N. W. 312.

The appellee contends that, while the evidence introduced tended to show that appellant had committed other crimes, yet such was admissible to show motive for the crime charged. Under the authorities, evidence to show motive is proper even though it might show the commission of another crime. While the general rule excludes evidence of other crimes, yet to this rule there are certain well-recognized exceptions. These exceptions were set forth in State v. Vance, 119 Iowa 685, 94 N. W. 204. See cases cited therein. Also, see State v. Clay, 220 Iowa 1191, 264 N. W. 77; State v. Hickman, 195 Iowa 765, 193 N. W. 21;

State v. Robinson, 170 Iowa 267, 152 N. W. 590; Boyd v. United States, 142 U. S. 450, 12 S. Ct. 292, 35 L. Ed. 1077; 22 C. J. S. 1084, section 682; Wharton's Criminal Evidence, Eleventh Ed., 483, section 343; 26 Am. Jur. 398, section 352. Appellee, while recognizing the general rule, argues that the evidence tending to show adultery and abortion as between the appellant and Miss Garrels comes within the exception: to show motive.

Appellee stated in argument that appellant had an inherent weakness for women, and follows this with the suggestion that many crimes are committed because of women. Following this assumption of this particular weakness of appellant, appellee goes a step further and argues inferentially that this weakness for women in general, and for Eva Garrels in particular, would motivate appellant in murdering his father. Counsel for appellee argue with considerable plausibility that Eva Garrels had become inaccessible to his desire to marry her because his father stood in the way; therefore, he must rid himself of his father. Counsel for appellee make the statement that shortly before she died appellant had been advised that his invalid wife would not live to exceed thirty days. Eva Garrels says that she and appellant began to keep company in the summer of 1942 and became engaged in the spring of 1943. As the statements which it is claimed show motive relate to events many months before the engagement of Eva and Carl, and still longer before the death of the father, it seems to us that they are too remote, have no connection with or relationship to the claimed murder. They are removed as to point of time and place, are not a part of the same transaction, and their happening could not in any logical sequence render the alleged murder more likely or probable. We hold that such evidence did not tend to show motive, was not relevant, and should have been excluded.

V. Appellant urges as error the exclusion of evidence offered by him relative to the deed to the forty acres made to him by his father in 1943. In its main case appellee showed the extent and nature of the property of Walter Knox at the time he had the stroke in 1935, and that same consisted of forty acres, $1,400 in cash, and a $2,000 mortgage. Later appellee offered in evidence the deed from Walter Knox to Carl Knox

of the forty acres, made in January 1943, consideration $1, love and affection; also a deed of the same land about two months later from Carl to one Graham, consideration $2,000 cash. Appellee in introducing this evidence did not indicate the purpose for which it was introduced. On defense appellant offered to show that on an occasion prior to the deed from Walter to Carl, Walter stated that he intended to make Carl a deed to the land and that Carl objected to his making such deed. Appellant tendered a witness, Noller, who stated that he was present and heard the conversation between Walter and Carl. The offered evidence was not admitted.

Appellant argues that the deeds were offered for the purpose of creating an inference that Carl was seeking to obtain possession of his father's property and then have his father placed in the county home. He calls attention to the fact that a claim of this nature was made by appellee in the trial of the case. We think that evidence such as was offered would have a tendency to rebut any inference which might arise by reason of the introduction of the deeds. After the appellee placed the deeds in evidence it seems to us that the appellant would have a right to show the entire transaction and that Carl's objection to his father's deeding him the forty acres would be competent for that purpose. Stafford v. City of Oskaloosa, 64 Iowa 251, 20 N. W. 174; Goodale v. Murray, 227 Iowa 843, 289 N. W. 450, 126 A. L. R. 1121. We hold that the court erred in excluding the offered testimony.

██ VI. Appellant claims as error the admission over objection of the evidence of certain expert witnesses offered by the State in which such witnesses gave opinions as to whether or not Walter Knox could have taken the caustic poison voluntarily; in other words, with suicidal intent. Appellant claims that the question as to whether the death of Walter Knox was by suicide or otherwise was the ultimate fact in the case and that to permit the witnesses to give opinions thereon was to invade the province of the jury. Doctors Weingart, Heald, and Groathause all testified over objection that Walter Knox could not have voluntarily taken the caustic and that his death was not caused by suicide. This testimony was in answer to that of expert witnesses offered

by the appellant that the caustic could have been taken voluntarily; in other words, that it could have been suicide.

Both parties have submitted many authorities in support of their respective contentions. We do not think that it is necessary for us to enter into an extensive analysis of these authorities. We think that the ruling of this court in the recent case of Grismore v. Consolidated Products Co., 232 Iowa 328, 5 N. W. 2d 646, is here controlling. In that case, Bliss, J., in a very complete and elaborate holding, went over the field thoroughly, making a very complete analysis of cases dealing with that matter in this and other jurisdictions, and held that it was proper for an expert to give an opinion even if it did go to the ultimate question to be decided, holding, in effect, that the jury was not bound to accept it as having greater weight than other opinions. We feel that the ruling of the court in that case is here controlling and that the trial court did not err in permitting such witnesses to give their opinions as set forth in the record.

Other errors have been set forth and argued by appellant. We have gone over them and find they largely concern the giving of certain instructions, the refusal to give others, and the action of the court in admitting and refusing to admit certain testimony. In view of our conclusion that the case must be reversed, we will refer to such matters very briefly. We do this for the reason that this opinion is already lengthy and in the event there is a retrial the situation may be somewhat changed. We will say that the instructions bear the impress of careful preparation and we think correctly and fairly set forth to the jury the correct principles of law as related to the facts appearing in the record. As to the admission of testimony and the rejection of some offered, we think the court did not abuse its discretion in its rulings thereon. Our excuse for this rather lengthy opinion is that the seriousness of the charge and the consequences to appellant seem to justify it in that particular.

By reason of the errors set forth the case is reversed.— Reversed.

MILLER, MULRONEY, SMITH, and WENNERSTRUM, JJ., concur.

BLISS, OLIVER, and GARFIELD, JJ., and HALE, C. J., dissent.

BLISS, J.—I dissent from the opinion of the majority. The greater part of appellant's argument is devoted to two assignments of error. The majority opinion deals largely with these two matters. Division III thereof holds there was reversible error in the cross-examination of appellant, as a witness in his own behalf, respecting his improper relations with Mary Fear, his second wife, prior to their marriage. I do not agree with this holding. On direct examination, as a witness for himself, examined by his attorney, appellant had testified with respect to his family: to his marriage to "Mary Fear *in March 1940*"; their living with his father on the latter's forty-acre pasture farm from their marriage until about January 1, 1942, when she returned to her father's home. In this direct examination, he said: "I have two children, *the boy was three August 3d* and the girl will be a year old December 18." The trial was had between the 8th and the 25th days, inclusive, of November 1943. It was in that period the appellant was testifying, so the "August 3d" to which he referred was "August 3, 1943." The boy was therefore born on August 3, 1940. The conception of the child was unquestionably prior to his marriage to Mary Fear, in the last of March 1940. Thus all of the information which the appellant insists was erroneously injected into the record by the cross-examination of appellant, as hereinafter set out, was voluntarily disclosed by the appellant on his direct examination. It is true that this family history of appellant was proper preliminary testimony, and it is also true that appellant's testimony respecting the dates of his marriage and the birth of his son had no relevancy to his guilt or innocence of the crime charged in the indictment, but after voluntarily bringing it forth, its further elicitation in the cross-examination complained of was not prejudicial error entitling him to a reversal. It was after this volunteered testimony that the following record was made on cross-examination:

"Q. Well you had had some improper relations with Mary Fear before you and she were married, had you not? [Defendant objects as incompetent, irrelevant, and immaterial, not cross-

examination. Objection sustained. State excepts.] Q. You told the officers since you were arrested that you had had some improper relations with Mary Fear before you and she were married, did you not? [Defendant objects as incompetent, irrelevant and immaterial, objects to the question as being improper conduct, been ruled upon. Objection overruled. Defendant excepts.] A. That is right.''

Thereafter in the cross-examination, without objection, appellant testified: ''Our first baby was born August 3, 1940.'' It has been suggested that appellant was not required to object, since his objection above noted was overruled. If, as a matter of argument, this be conceded, it nevertheless was not erroneously prejudicial. The answer was merely a repetition of his testimony on direct examination. It was not error when first given and its repetition cannot, in reason, be said to have been prejudicial error. Concerning these two questions and answers the majority opinion states: ''We hold that both questions were improper and highly prejudicial, calling for irrelevant evidence; not proper cross-examination; and that the court abused its discretion in permitting them.''

Everything that the questions called for and the answers made known was fully and definitely disclosed to the jury by appellant's answers to questions directed to him on his direct examination by his own attorney, and thereafter reaffirmed by him on cross-examination, without objection, respecting the matter of interrogation and answer in his direct examination. If it be conceded that the matter inquired about in the questions objected to was irrelevant, and if it be conceded, arguendo, that it was not proper cross-examination—which objection was not made to the second question—yet, under the record made, there was no prejudicial error for which a reversal should be granted.

Division IV of the majority opinion holds that the testimony of certain peace officers as to appellant's admissions to them, after his arrest, of his illicit relations with nineteen-year-old Eva Garrels, her resultant pregnancy, and their procurement of its termination by abortion was prejudicial error. I disagree with this decision of the majority.

The majority opinion states:

"If true, the statements of appellant showed the commission of two independent crimes months before the death of the father. How possibly could there arise any inference. that, because appellant debauched Eva Garrels at least seven months before, and procured an abortion to relieve her from pregnancy, he therefore killed his father? If relevant at all, it must be because, having committed adultery, followed by an abortion, he then became possessed of a motive which but for those things did not exist, which might prompt him to desire to murder his father."

From the above-stated quotation it is fairly inferable that the majority opinion misconceives the theory of the State in offering the testimony of which appellant complains. The testimony was offered for but one purpose and that was to establish a motive on the part of the appellant to murder his father. And that motive was that he desired to marry Eva Garrels, became engaged to marry her, and made plans to that end; and the care, condition, and existence of his father was an obstacle in the way of consummating the marriage. The testimony of their going together steadily from August 7, 1942, until his arrest on July 30, 1943, of his courting her, of her spending much time at the Knox home, doing work there for which she refused to accept any money as compensation, of her spending many nights there with the appellant and having sexual intercourse with him, of their knowledge in December 1942 of her pregnancy and their plan to procure an abortion, of its accomplishment at an undisclosed later date and the payment of the expense thereof by appellant, of appellant's giving to her money, dresses, furniture, dishes, silverware, jewelry, a riding horse with saddle and bridle, of his expressed liking for her and intention to marry her, of his neglect of and disregard for his wife and children, of the engagement of marriage to Eva Garrels, of their being together and sleeping together either at the Garrels home or the Knox home every night, including that of July 20th, the last night for Walter Knox, the night of his death, and every night thereafter until the appellant's arrest: all these

facts and numerous others are but convincing items of evidence establishing to a moral certainty the single fact of the planned marriage of these two people—the motive which prompted the removal by murder of his father as an obstacle and a burdensome inconvenience in their future way of life.

The fact that this evidence indicated him to have been an adulterer and the procurer of an abortion did not render the evidence inadmissible. If evidence is material and relevant to any issue or is otherwise admissible, the fact that it tends to establish the accused's guilt of a crime other than the one for which he is on trial furnishes no ground for its rejection. This has been the holding of this court and of courts generally. Perhaps our latest decision is State v. Dunne, 234 Iowa 1185, 1195, 15 N. W. 2d 296, 301, 302, wherein the court said:

"While it is said to be the general rule that evidence is not receivable of a crime not charged in the indictment, there are well-recognized exceptions to the rule. Evidence of another offense is admissible where it is so related to the offense charged that proof of the former tends to establish the latter * * * Evidence otherwise competent to prove some fact material to the crime charged is not inadmissible because it tends to prove defendant guilty of another crime."

Among the supporting authorities cited therein, and others so holding, are: State v. Vance, 119 Iowa 685, 686, 94 N. W. 204; State v. Grimm, 221 Iowa 652, 266 N. W. 19; 20 Am. Jur. 289, section 310; 22 C. J. S. 1089, section 683; annotation 3 A. L. R. 1540; State v. Wallack, 193 Iowa 941, 942, 188 N. W. 131; State v. O'Connell, 144 Iowa 559, 561, 123 N. W. 201; State v. Wrand, 108 Iowa 73, 76, 78 N. W. 788; State v. Wheelock, 218 Iowa 178, 184, 254 N. W. 313; State v. Campbell, 213 Iowa 677, 683, 684, 239 N. W. 715; State v. Burzette, 208 Iowa 818, 824, 825, 222 N. W. 394; State v. Friend, 210 Iowa 980, 990, 991, 230 N. W. 425; State v. McCutchan, 219 Iowa 1029, 1046, 1047, 259 N. W. 23.

One of the exceptions to the above-noted general rule, which it is proper to establish by evidence of other offenses committed by the accused, involves the matter of motive. This

court has so stated in State v. Vance, State v. Grimm, State v. McCutchan, all supra, and in State v. Porter, 229 Iowa 882, 885, 294 N. W. 898, and State v. Crabbe, 200 Iowa 317, 319, 204 N. W. 272.

Included within these recognized exceptions, in addition to the issue of the motive for the crime, are the intent to commit the crime, knowledge, absence of mistake or accident, a plan or scheme embracing the commission of two or more crimes so similar or related that proof of one or more tends to prove the crime charged, identity of the person charged, or where the matters are closely interwoven in a related transaction.

If the testimony is relevant, the fact that it discloses other misconduct or criminality on the part of the accused has never been recognized or implied as a bar to its admissibility. As said by Wigmore in his great work on Evidence, Third Ed., Vol. I, 713, section 216:

"On the contrary, no fallacy has been more frequently or more distinctly struck at by denial, by argument, by explanation, on the part of the Courts. It has been rebuffed, rebuked, repudiated, discredited, denounced, so often that it ought by this time to have been abandoned forever. That it does still crop up again from time to time is apparently due in part to the inherent difficulty of distinguishing between conduct as showing character and conduct *as showing other things*; but also to the failure to appreciate that the rejection of past misconduct by the character-rule is never due simply to the incidental circumstance that it is misconduct, but to the fact that it is offered to show character and that herein consists its impropriety. *If there is any other material or evidential proposition, for which it is relevant, and if it is offered for that purpose, it is receivable, and its quality as misconduct or crime does not stand in the way.* The persistency of the fallacy, and its lack of foundation in law, make it worth while to exhibit fully, from the utterances of the judges, their constant repudiation of the notion that the criminality of conduct offered for some relevant purpose is an obstacle to its reception." (Italics ours.)

An able opinion, often cited and quoted on this question,

is State v. Lapage, 57 N. H. 245, 287, 24 Am. Rep. 69, 73, which states:

"These questions in regard to the relevancy of particular items of testimony always depend upon the peculiar circumstances of the case, and must be solved by the application of sound judgment and common sense. * * * There is a great mass of cases so similar in their circumstances, and which have occurred so often, that they may be taken as evidence of the application of the common-sense and cultivated reason of a great many individuals, and so come to have the force and authority of established law.

"I think we may assume, in the outset, that it is not the quality of an action, as good or bad, as unlawful or lawful, as criminal or otherwise, which is to determine its relevancy. I take it to be generally true, that any act of the prisoner may be put in evidence against him, provided it has any logical and legal tendency to prove any matter which is in issue between him and the state, notwithstanding it might have an indirect bearing, which in strictness it ought not to have, upon some other matter in issue. * * * But I think the general rule is, that no testimony which has a legitimate bearing upon any point in issue can be excluded."

As said in People v. Wood, 3 Parker Cr. Rep. 681, 684:

"The proper inquiry, when the circumstance is offered, is, does it fairly tend to raise an inference in favor of the existence of the fact proposed to be proved? If it does, it is admissible, whether such fact or circumstance be innocent or criminal in its character. It does not lie with the prisoner to object that the fact proposed as a circumstance is so heinous in its nature, and so prejudicial to his character, that it shall not be used as evidence against him if it bears upon the fact in issue. The atrocity of the act cannot be used as a shield under such circumstances, or as a bar to its legitimate use by the prosecution. If it could, many criminals might escape just and merited punishment solely by means of their hardened and depraved natures."

Speaking to this point for the Illinois Supreme Court, in People v. Spaulding, 309 Ill. 292, 304, 141 N. E. 196, 201, Judge Thompson said:

"That evidence offered proves or tends to prove an offense other than the one with which the defendant is charged is never a valid objection to its admissibility. When such evidence is offered the same considerations with respect to its admissibility arise as upon the offer of any other evidence. The question is, Is the evidence relevant? Does it tend to prove any fact material to the issue involved?" See, also, People v. Rappaport, 364 Ill. 238, 4 N. E. 2d 106, 109.

The majority opinion states:

"This evidence came out in appellee's case in chief. At that point the character of the appellant was not in issue. The evidence did not come out 'incidentally,' such as in some connection with some other matter, but came out directly and was not in response to any claim made by appellant."

It was the right and duty of the State to offer this testimony in its case in chief. It was not required to bring it in "incidentally," or indirectly, or to await a "go" sign from the appellant. In the prosecution of a criminal action, proof of motive, though not an essential element or ingredient of the crime charged (State v. Kneeskern, 203 Iowa 929, 943, 944, 210 N. W. 465; State v. Meyer, 180 Iowa 210, 219, 220, 163 N. W. 244; State v. Whitbeck, 145 Iowa 29, 43, 123 N. W. 982; State v. Quan Sue, 191 Iowa 144, 155, 174, 179 N. W. 972; State v. Saling, 177 Iowa 552, 561, 159 N. W. 255) is always relevant, and competent to be shown. It is a well-settled principle in every court. We said in State v. Campbell, 213 Iowa 677, 683, 684, 239 N. W. 715, 719:

"The testimony of Dickerson, which was admitted by the court, has an important bearing as evidentiary facts upon the motive of the defendant, Campbell, and for that reason was clearly admissible. *It is always competent to prove a motive for the commission of a crime,* and evidence relative thereto is admissible as having more or less weight according to the other

proved facts and circumstances with which it is related.'' (Italics ours.)

See, also, People v. Mihalko, 306 Mich. 356, 10 N. W. 2d 914; Commonwealth v. Goldenberg, 315 Mass. 26, 51 N. E. 2d 762; Commonwealth v. De Petro, 350 Pa. 567, 39 A. 2d 838; McDonald v. State, 241 Ala. 172, 1 So. 2d 658; State v. Hudson, 218 N. C. 219, 10 S. E. 2d 730; West Digests, Criminal Law, Key No. 342; I Wigmore on Evidence, Third Ed., 558, section 118.

Motive is especially important where the prosecution must rely upon circumstantial evidence. State v. Gaines, 144 Wash. 446, 258 P. 508, 511; People v. Harris, 136 N. Y. 423, 33 N. E. 65, 74; State v. Reding, 52 Idaho 260, 265, 13 P. 2d 253, 254; (In the last-cited case, the court said: ''In a case like the one at bar, where the evidence is all circumstantial, motive becomes a matter of most earnest inquiry. [Citing authorities.] In such circumstances the state may advance any motive within the range of human experience and reasonable probability.'' (Citing authorities); 1 Wharton, Criminal Evidence, Eleventh Ed., 288, section 246; O'Brien v. Commonwealth, 89 Ky. 354, 12 S. W. 471, 473, 11 Ky. L. Rep. 534.

This testimony was a part of the State's main case. It was offered only for the purpose of showing the appellant's motive. It was not offered to show his bad character, nor to show the commission of two other crimes, nor that because of their commission he was of such evil nature that he would be more likely to murder his father. Since it was admissible on the issue of motive, the fact that it also reflected upon his character did not make it inadmissible. Neither was it necessary that the State should withhold the testimony until the appellant had put his good character in issue or become a witness. This is the thought in the quotation from Wigmore, above noted. In State v. Rowley, 197 Iowa 977, 980, 981, 195 N. W. 881, the defendant was indicted and convicted for the crime of attempting to procure the miscarriage of a woman. The State in its case in chief put on testimony of her admission that she was in the business of producing abortions and offered direct proof of other abortions performed by her. The court held the evidence of other crimes was proper to show her intent in the case on trial. The

opinion quoted from People v. Hobbs, 297 Ill. 399, 410, 130 N. E. 779, 783, wherein the court said:

"In its case in chief the State must prove all of the elements of the crime, including the intent, and need not wait to learn the character of the defense that is to be made by the defendant."

In People v. Everhardt, 104 N. Y. 591, 595, 11 N. E. 62, 64, evidence was admitted that the accused, who was charged with uttering a forged check, had uttered other forged checks on other occasions. The court held:

"In this there was no error. The defendant by his plea of not guilty had put in issue everything which it was incumbent upon the people to prove. They had no direct or positive evidence that he personally forged the check which he uttered, and it was open for him to show that at the time he uttered it he had no knowledge that it was forged, and was therefore innocent of crime; and for the purpose of showing the prisoner's guilty knowledge in such cases it has always been held competent to prove other forgeries. [Citing cases.] Such proof is not received for the purpose of showing other crimes than that charged in the indictment, but for the purpose of showing the guilty knowledge and intent which are elements of the crime charged, and it can be considered by the jury only for that purpose. Although the evidence of Gaylord, corroborated as it was, as to the guilty knowledge of the defendant, was quite clear and convincing, yet the people were not bound to rest upon a prima facie case, but had the right to confirm that evidence by the proof as to the uttering of other forged checks."

So in the case before us, it was the right and the duty of the State to prove the motive of the appellant by such evidence as was available to it. In its opening statement it no doubt disclosed to the jury and to the appellant its purpose to show the appellant's intention to marry Eva Garrels, and that the father was an obstacle to that marriage. If the appellant could show that he had no intention of such marriage—this was proper for him to do, by any evidence, direct or circumstantial, available to him—he could have thereby struck the foundation from under

the motive asserted by the State. The State knew this but it did not know just what evidence the appellant would offer. It there- fore rightly and properly offered every item of evidence respecting the conduct and relations of appellant and this woman which together tended to establish their intention to marry.

In State v. Burzette, supra, 208 Iowa 818, 824, 825, 222 N. W. 394, 397, speaking through Justice Evans, the court said:

"The contention is that this evidence served no material function in the case, and that its only effect was to permit the State to prove the commission of another crime. *The evidence was not offered for the purpose of proving another crime.* If the facts proved had a material bearing upon the issues in the case, they were admissible in evidence; and this would be true regardless of whether they constituted a crime or not." (Italics ours.)

The quotation is repeated in State v. Friend, 210 Iowa 980, 991, 230 N. W. 425.

The majority opinion states that this testimony had the effect of injecting into the case, by insinuation and suggestion, collateral and irrelevant matters, moving the jury to consider incidents of appellant's past life, years removed from the time of the crime charged. The testimony was properly admitted and if it placed some burden upon him it was fairly incident to the trial. He made no attempt to disprove any evidence offered by the State to sustain its contention of the intended marriage. The appellant was not taken by unfair surprise. His whole past life was not raked over by the prosecution, as has been done in trials in Continental Europe. He had been married twice and most of the facts concerning both of these relationships were volunteered by himself. His relations with Miss Garrels covered less than a year before the death of his father. He was not unfairly prosecuted. As said by Wigmore, Vol. II, Evidence, Third Ed., 205, 206, section 305:

"Evidence tending to show, not the defendant's entire career, but his specific knowledge, motive, design, and the other immediate matters leading up to and succeeding the crime, is of a class always to be anticipated and is in each given instance

rarely a surprise; moreover, the kernel of the objection of unfair surprise, namely, the impossibility of exposing fabricated evidence, is wanting where the evidence deals with matters so closely connected with a crime as design, motive, and the like.''

The majority opinion sets out various definitions of the term ''motive,'' as given by the courts and other authorities. Simply stated, as used in criminal law, it is the cause, reason, or emotion that prompted and impelled the commission of the crime charged. Crimes are ordinarily not committed without a motive. Since they are usually committed in stealth and secrecy, the discovery and proof of the motive is often difficult and sometimes impossible. But whatever the moving cause may be, the fact of its existence must be shown by such relevant evidence as is available. For these reasons the courts have permitted a wide range of examination by the prosecution in developing circumstances tending to establish the moving cause. See O'Brien v. Commonwealth, supra, 89 Ky. 354, 12 S. W. 471, 473, 11 Ky. L. Rep. 534; State v. Simpson, 109 Mont. 198, 95 P. 2d 761; Commonwealth v. Mercier, 257 Mass. 353, 153 N. E. 834, 838; State v. Massey, 32 N. M. 500, 258 P. 1009; Sauer v. State, 166 Miss. 507, 140 So. 225; Walters v. State, 156 Md. 240, 144 A. 252, 253; People v. Jones, 293 Mich. 409, 292 N. W. 350, 352; Sullivan v. State, 171 Ark. 768, 286 S. W. 939, 941, 942; State v. Reed, 53 Kan. 767, 37 P. 174, 42 Am. St. Rep. 322; II Wigmore on Evidence, Third Ed., 328, section 389; 13 R. C. L. 910, section 214; 22 C. J. S. 933–935, section 614.

The appellant, as a witness, never admitted that he intended to marry Eva Garrels, but the record as a whole clearly shows this was the intention. The motive varies as individuals vary. What would be inadequate with one might be all-powerful with another, depending upon his temperament, his tendencies, and the surrounding circumstances. Ordinarily an existing marriage and the children of that marriage would be a restraint upon a husband's active plans for wooing and winning another bride. Ordinarily the obligation and the heavy burden of caring for a helpless father would also be a deterrent. But it was not so in this case. The facts, which the jury could have found to be established under the record, are therefore important in

the proper determination of the questionèd rulings of the trial court.

Appellant's father, sixty-nine years old, had a stroke, completely paralyzing the left side of his body, early in 1935. He sent for appellant, who came from California, about March 1935, bringing with him June, a seventeen-year-old girl, whom he voluntarily testified he had eloped with and married. During 1935, and until April 1936, the father was cared for in a hospital and in the homes of relatives and friends, aided by some attendance from appellant. He and his bride lived in the small home on a forty-acre tract of the father until the latter months of 1935, when June left appellant and returned to California. Appellant's father never lived in their home. The record discloses nothing further than this about this woman. In April 1936 appellant's father was brought to this farm. When he was stricken he had $1,400 in cash, and a mortgage for $2,000, which the mortgagor paid him by check on April 8, 1936. There was little tillable land on the forty. Appellant worked on the place during 1936. In 1937 he secured a "pickup" truck and began doing outside work, trading in livestock, which work he increased during the years he remained on the farm until it was his chief business. His second wife, from March 1940 to January 1942, stayed intermittently on the farm and at her parents' home in town until the latter date, when she and the children took up their permanent home with her parents. There is much evidence that appellant neglected his father on the farm: his person, clothes, bedding, and surroundings were filthy with bodily discharges; his beard and hair were not cared for; witnesses calling upon him found him thirsting for water. The sheriff called upon appellant in 1937 at the farm and told him that he did so because of complaints made as to his mistreatment of his father. On August 7, 1942, he met Eva Garrels. They were together and in each other's company steadily thereafter. At this time she learned that appellant had a wife and family. Their illicit relations began rather promptly. She became pregnant. Appellant learned of it in December 1942 and they decided that an abortion should be performed. Later—and the time does not appear in the record—the abortion was

procured in Ottumwa and appellant paid $50 for the expense of the operation. In November 1942, appellant secured a four-room house about a half block from the stockyards in Sigourney, into which he moved his father. His father's room was the northeast one. Eva was at the house to welcome them and to cook their first meal there. She returned from her operation in Ottumwa to this home to abort and to convalesce. The only other bedroom in the house was that of appellant in the northwest corner. She worked occasionally in the home until in April 1943. Between that time and November 1942 she had stayed at the home about thirty times. She was there July 4 and 5, 1943. The house was always kept locked when the father was there alone.. The back door was padlocked on the outside and the front door and another door were locked from the inside. When she and appellant left the house, "Lots of times he would tell me to lock this door and I couldn't." It was the padlocked kitchen door that she had difficulty in locking. She and appellant would leave the house usually to go to her home or to Ottumwa, "Just for the evening." She and appellant became engaged about March 1943. He bought her a watch for Christmas 1942. He bought her an engagement ring in Ottumwa for $284.46. On January 30, 1943, appellant's father executed a deed conveying the forty-acre farm to appellant. The recited consideration was $1 and love and affection. He sold the farm to one Graham for $2,000. The deed was recorded April 7, 1943. On April 17, 1943, from the sale proceeds he purchased at a local bank $1,500 of traveler's checks. In addition to the diamond ring he bought Miss Garrels a wristwatch, clothes, furniture, a set of dishes, a set of silver, a riding horse, saddle and bridle, and other things. He gave her a book of ten traveler's checks for $10 each. She had seven of them when appellant was arrested. Some of the checks he put in his bank account and checked out. In the pocket of his car when arrested he had thirteen traveler's checks each for $20. These were for their wedding trip when his wife should die. He told the undertaker about ten days before his father's death that his wife could not last much longer and that he wanted him to prepare her for burial. When he came to the undertaker's parlor in the very early hours of July 22,

1943, just following his father's death he said to the under-
taker: "It's Dad instead of Mary." He then asked the under-
taker if he would not make him a better price since he was
buying two caskets. Appellant told a number of different and
conflicting accounts of what took place at the home the day
and night of his father's death, which I will not discuss. The
undertaker and the examining doctors at the two autopsies found
the lips, mouth, throat, esophagus, and upper stomach of the
deceased burned to a chalky white with a caustic poison, of the
same kind as found in a can container in the house, which was
in the bedroom and had been sometimes used to disinfect the
toilet bucket. It was the theory of the State that appellant had
given it to him under the pretense that it was milk, or had
rendered him partly unconscious by blows and forced him to
swallow it. He had numerous antemortem bruises on his body,
concerning which a doctor said: "It is highly impossible that
any fall out of bed could give rise to such a multitude of injuries
and in such different places." He died in the early evening,
and appellant, not wishing anyone to see the body in its foul,
filthy, and uncared for condition, spent the night until 1 o'clock
a. m. washing the body, cutting the beard and hair, burning the
clothing, bedding, and refuse, and making some attempt to
scrub the floor. The room of the old gentleman was at all
times putrid with stench. A brother complained to the author-
ities two or three months before the death. There was evidence
that the landlord had told appellant he must vacate in thirty
days because of the conditions there and the frequent presence
of the Garrels girl. The appellant spent the night of July 20,
1943, with this girl. When he left the undertaker at about 4:30
a. m. of July 22, 1943, after his father's death, he went at once
to the Garrels home, knocked on Eva's door and told her of his
father's death, went to bed there and slept soundly until he was
called to breakfast. He slept at her home every night there-
after until July 30, 1943, except the night of July 28th, when
both of them stayed all night at the Knox home. She cleaned
all the rooms except that of the father at this time. He was
arrested at the Garrels home on July 30, 1943.

Appellant had said he and the girl were going to get

married and take a wedding trip just as soon as his wife died. Just what, if any, plans appellant had about caring for the father while he was absent on the wedding trip does not appear, although he had tried to place him in the county home a few weeks previous to his death.

The relations of appellant and this woman were such and were so interrelated with the father and his present and future care that the jury were entitled to know what took place between appellant and her. I think it was for the jury to say whether Walter Knox was not a factor—and a disturbing factor—in the plans of appellant and her, and whether or not those plans and the relations which existed between them and their past conduct were not a motivating influence in bringing about his death.

The court in its instructions limited the consideration of the conduct of these two to the issue of motive. We must keep in mind that jurors are ordinarily persons of judgment, with knowledge of human nature and human conduct, and not easily diverted from the true issues to be determined by them. The jury convicted appellant of murder in the first degree, and not of procuring abortion or of adultery. It is hardly reasonable to say that they were influenced improperly by the testimony complained of. They were entitled to hear all facts having a probable tendency to throw light on the issue before them. A trial court should have considerable discretion in the admission of such evidence. The crime was a horrible one. The evidence was largely circumstantial but it amply supported the verdict of the jury.

The record shows the appellant to be a person with little conception of moral or natural obligations. He was brutal in his everyday neglect and abuse of his helpless father. He left him to flounder about twenty-four hours of the day in his own excrement, in clothes and in a bed and a room that were filthy. He left him alone, locked in for days and nights. A bucket under the seat of a chair with a hole in it beside the bed was the toilet. Appellant let the bucket become full before emptying it. The old man's uncut hair and beard, his body, clothes, and bed were besmeared with the discharges of his body. Appellant's second wife, the Fear girl, would not stay and went home. The Garrels woman had worked in the house for a time. She refused

to accept any pay for her work. They wished to get married. It is very probable that she insisted that she would not care for the old man. She became pregnant prematurely for their plans. Appellant's wife was still alive and the old man was in the way. They could not marry yet. The abortion seemed necessary. When it seemed certain the wife would shortly die, the old man was still in the way. She had no more moral scruples than he. He had no regard or care for his wife or children. He lavished his father's money on the Garrels woman, but none on his wife or children, so far as the record shows. Neither had the slightest regard nor feeling for the father. She knew the filth in which he lived. She never attempted to care for him or even wash his face while she was the mistress of appellant, and of course she had no intention of doing so or caring for him when she became the wife. Appellant knew this. She had been at the Knox home repeatedly, worked there, and left him in his filth. Appellant testified that when he died: "his father needed a shave, needed a hair cut and needed washing. *That he had not cleaned him up since he had moved from the farm.* He was filthy and dirty." He had taken everything the old man had: the $1,400 cash, the $2,000 mortgage had been collected, the forty-acre farm—all of which his father had when the son came to take care of him—were dissipated, except a few hundred dollars of traveler's checks for the wedding trip. It is argued that he could have left the old man and gone away with the woman. He knew this would not look so well to the community. In addition to his natural and legal obligation to care for him, he had taken his property and had him housed in a rented shack. The owner of it, his cousin, objected to having the old man live in such a filthy condition in so public a place. He objected to the appellant's relations with the Garrels woman there. He insisted on the house being vacated. The old man interfered with the plans of Carl and Eva. They could not desert him, and they did not want him. He was in their way and had to be removed.

It is clear under the record that an impelling motive for his murder was the relations and plans of this couple. Evidence of their entire relationship and conduct was material and

proper. The old man's mouth was not burned with hot soup, nor with heat from an oil stove in mid-July while he slept with his mouth open, as appellant suggested to the undertaker. Nor was it someone else, as he suggested, who had a key and "who must have slipped in and did it." No one other than the appellant had any motive for the killing, and one of these motives was to marry Eva Garrels and live with her without the burden of his father's care. The record warranted the jury in so finding.

When a peace officer upbraided him for his relations with the Garrels girl, when his wife was on her deathbed from an incurable cancer, he brazenly remarked "that he had no regrets —that he never loved her and they never got along." Instead, he was irked at the slow approach of death. He was arranging her obsequies before the Grim Reaper was ready. Impatient to be off with the old and on with the new.

And yet the majority of my brothers on the court say, as a matter of law, that the relations, conduct, and plans of the appellant and this woman, from August 7, 1942, to July 30, 1943, including the abortion and adultery—relations which drove him still further away from his wife and children—were not proper for the jury to hear in determining whether they were a moving cause in the killing of his neglected, abused, helpless, bedridden father, referred to by him, according to witnesses, as the "old son of a bitch who was always hollering." I cannot go along with them.

Both the father and the wife of appellant stood in the way of his marriage with Eva Garrels. It was without regret to him that death was soon to remove his wife as an obstacle. She died just three weeks after his father's death. The majority opinion concedes that had appellant murdered his wife his adulterous relations with his paramour and the procurement of the abortion would be admissible on the matter of motive. The majority opinion states:

"Had Carl been accused of the murder of his wife, Mary, such evidence we think might show motive. His wife would stand as an obstacle to his marrying Eva. Nothing of the kind would be true of his father."

I think no one would seriously urge that the testimony would not be admissible to show motive in such case. See State v. Flory, 198 Iowa 75, 80, 81, 199 N. W. 303, and cases cited. What reason does the majority opinion give for saying it is not admissible in this case? It says his father was not an obstacle. The majority seriously trespass upon the rights and duties of the jury in so holding as a matter of law. Under the record in this case it was for the jury to say by its verdict whether or not it was a fact that the father did stand in the way of the early marriage of the appellant and this woman. If the intended marriage was the motive for removing the obstacle, the evidence tending to establish that fact would, of course, be. relevant, regardless of who was the obstacle to be removed. If the evidence complained of was admissible, as conceded by the majority, were his wife the victim, because she was in the way of his marriage, then it should also be conceded that it was admissible in this trial, because there was ample support for a finding by the jury that he also stood in the way of the marriage, in the mind of appellant.

The murder was not because he wished only to be rid of the care of his father. He had neglected, but tolerated, that obligation for years. But this woman had not come into his life until the August previous, and there would not be any of his father's money left for the wedding trip if they waited until nature took its course.

If a baby had been born because of the adulterous intercourse of these parties, evidence of that fact would have been admissible to show their relations—that is, whether their marriage was contemplated. If that is true, certainly evidence of abortion to unlawfully remove the issue of that intercourse would also be admissible.

While there is no such concession in the majority opinion, it has been mentioned in our discussions that, while appellant's infatuation for this woman, his gifts to her, their courtship, their engagement to marry, their contemplated honeymoon trip, and all conduct between them ordinarily and *conventionally* incident to courtship and contemplated marriage would be admissible, his sexual relations with her, the pregnancy and the

abortion, would not be admissible. I, of course, fully agree that all of the matters noted above which comport with proper conduct between a man and a woman contemplating marriage should be admitted to prove that is their intention. But when improper relations and indiscretions take place, as they too often do, a court should not say, as a matter of law, that they have no reasonable tendency to prove that the parties contemplated marriage. It was for the jury to say whether the appellant and this woman had adulterous relations and it was for the jury to say whether such relations were relevant and of probative value in determining whether it was their intention to marry. He bought clothes and jewelry for her, and a riding horse for her pleasure. He bought furniture, dishes, and silverware for their future home. No one would seriously contend that such conduct was not indicative of their purpose to marry. He no doubt showed his love for her by caresses and bodily contacts needless to here detail. Are we going to say that a jury may be told of the conventional caresses, but nothing of the caresses that create, even when they are inseparable parts of their premarital relationship? Just where in the amorous approach and contact is the line of evidential admissibility to be drawn? It may be fairly assumed that he had no evil purpose toward Miss Garrels in his relations with her, and that what he did when he discovered her pregnancy was what he thought the best thing to do under the circumstances, for himself and for her. At that time he probably did not know how long his wife would live, or when a lawful marriage with Miss Garrels could be had. If her pregnancy became known, or a child was born to her as an unwed mother, it would be an inerasable blot against his wife-to-be. He spent $50 for an operation which he thought was for her benefit. If he had spent $50 for dental work for her or for glasses to correct her vision, these two expenditures most certainly could have been shown as relevant evidence tending to prove that they contemplated marriage. They would have been expenditures very beneficial to her, such as any man might wish to make for the woman who was to be his wife. For the same reason it was proper for the jury in this case to consider the testimony con-

cerning the abortion, in connection with all other evidence of the relations of the appellant and this woman, in determining whether appellant desired her for his wife and contemplated marrying her. If his proper relations with her—his courtship, gifts, etc., evidencing his contemplated marriage—were admissible for their bearing upon the issue of his desire to remove his father as an obstacle to the marriage, then his sexual relations and the resulting abortion were also admissible for the same purpose. His open and adulterous cohabitation with this woman, his criminal participation in the procuring of her miscarriage, his brazen disrespect and disregard for his wife and children, as well as his gifts to Miss Garrels and the lavishing upon her of money belonging to his father and needed for his proper care, all show the extent and the intensity of his mad infatuation for this woman. Each and all of these items of evidence were relevant and properly tended to show whether this infatuation and desire for her were an adequate motive for the crime charged. They were all parts of a single picture and the jury was entitled to see it without deletion.

In People v. Harris, supra, 136 N. Y. 423, 451, 33 N. E. 65, 75, the defendant was charged with murdering his wife by poison. He had secretly married her about a year previous to her death, to overcome her scruples against improper sexual relations. During that time he, a medical student, had told others of performing an abortion upon her. The next time he did not succeed and her uncle, a doctor, removed a dead foetus from her. Her mother then learned of the marriage and insisted upon a public marriage, but he put off doing so. He had secretly married two other girls. He then gave his victim four capsules, supposedly containing quinine, for her headaches. One of them he emptied and filled with morphine. It caused her death. The court permitted evidence of these abortions, and also of an incident of his sexual relations with another girl, and of his proposition to her that she marry some rich old man and that they would then put him out of the way with a pill and get his money. In holding both the testimony as to the abortions and also of the latter incident proper, the court, in speaking of the latter, said:

"But such testimony was relevant upon the question of motive. * *.* If this conversation, so overheard by the witness, furnished any clue to the existence of motives, we cannot assume, nor say, that it was meaningless, or immaterial. The weight and importance to be attached to it were for the jury to consider, in the light of all the circumstances. It did tend to prove that the defendant's feelings towards his mistress were not transient, or ephemeral, in their nature, but that they were sufficiently intense to give rise to a desire that their relations should be made durable. * * * I think these considerations are sufficient to show the relevancy of the evidence, as characterizing the exceptional nature and intensity of the adulterous relation, and, in that respect, bearing upon the existence of motives to get rid of his wife. * * * That the accused has suffered from the unconscious influence upon opinion of the record of a bad life is not to be assumed as against jurors, who have sworn to convict upon evidence only which establishes the guilt of the accused."

So in the case before us, the appellant's relations with Eva Garrels, including his criminal conduct, were relevant not only as to what was the motive but its extreme intensity, and its sufficiency to overcome the natural repugnance to destroying his father.

Believing that the appellant had a fair and impartial trial, free from any reversible error, I would affirm the judgment.

OLIVER and GARFIELD, JJ., join in this dissent.

HALE, C. J. (dissenting)—I agree with Justice Bliss that this case should be affirmed.

The two alleged errors most seriously complained of relate to the cross-examination of defendant and the admission of testimony as to certain parts of defendant's relationship with Eva Garrels.

The rule which the majority seek to apply is that laid down in section 13892, Code of Iowa, 1939, and especially that part which provides that the State shall be strictly confined therein to matters testified to in the examination in chief. But in applying this provision of the Code we must not forget that of

equal importance is that part of the section which provides that when a defendant testifies in his own behalf he shall be subjected to examination as an ordinary witness. There is no reason why matters testified to in chief by the defendant may not be amplified on cross-examination. See our recent case of State v. Ragona, 232 Iowa ·700, 5 N. W. 2d 907. I do not think that the State brought out, or sought to bring out, in that part of the cross-examination objected to, any fact other than had previously been shown by the defendant himself. .A defendant, who, as a witness, testifies to a fact, cannot take advantage of this Code provision to avoid being cross-examined on that fact. The section was designed to protect a defendant from examination on matters outside of, and not relating to, his examination in chief, but it need be extended no further.

The majority opinion objects to the introduction of testimony showing adultery and assistance in producing an abortion. The rule that testimony relating to other crimes is admissible, when relevant, to show motive, intent, absence of mistake or accident, a common scheme, or identity, has long been established in this state. These exceptions to the rule that the State cannot prove against defendant any crime not alleged in the indictment are clearly set out in State v. Vance, 119 Iowa 685, 94 N. W. 204, and have been consistently followed. If the State had shown separate criminal acts not connected with other evidence tending to show a general purpose or design there might be reason for their exclusion, but here there was ample evidence as to the relations of defendant and Eva Garrels, all of which tended to show their future plans and purposes, of which evidence the admitted testimony constituted a connected and relevant part. It did not constitute testimony of isolated acts. The condition of the father was as much of an obstacle to their future matrimonial plans as was defendant's wife, with the exception that it was apparent he was soon to be relieved of the latter. This series of circumstances introduced in evidence was properly admitted as tending to show motive. If any part of defendant's conduct and relationship with Eva Garrels was admissible, and certainly there were such parts, then at what point could the trial judge refuse the introduction

of further testimony? How much could he admit and how much refuse? We are putting a difficult problem to a trial judge in a case of this kind if we thus limit testimony as to motive.

After careful examination of the record I am satisfied that the defendant was fairly tried, that his rights were fully protected, and that there was not reversible error.