# IN THE COURT OF APPEALS OF IOWA

No. 22-1976
Filed February 7, 2024

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**MATTHEW RAY ONEY,**
      Defendant-Appellant.

_____

Appeal from the Iowa District Court for Crawford County, Zachary Hindman, Judge.

The defendant appeals his convictions for arson in the first degree, attempted murder, four counts of assault, criminal mischief in the first degree, and neglect or abandonment of a dependent person. **AFFIRMED.**

Priscilla E. Forsyth (until withdrawal), Sioux City, and Tiffany Kragnes, Des Moines, for appellant.

Brenna Bird, Attorney General, and Nicholas E. Siefert, Assistant Attorney General, for appellee.

Considered by Greer, P.J., Ahlers, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**BLANE, Senior Judge.**

Matthew Oney appeals the jury verdicts convicting him of arson in the first degree, attempted murder, four counts of assault, criminal mischief in the first degree, and neglect or abandonment of a dependent person, claiming there is insufficient evidence to identify him as the perpetrator. We find there was substantial evidence to identify him. We affirm.

I.      **Facts and procedural background.**

Matthew Oney had previously been married to H.O., and they had a daughter, who was four years old at the time of the events. Following their divorce, they continued an on-again, off-again, troubled relationship. During 2021 up to January 2022, Oney complained about his problems with his ex-wife to a co-worker. The co-worker testified Oney told him that if H.O. ever tried to leave him and take their daughter with her, he "would put her in the woods," explaining his understanding that "[t]here's enough woods around here, she would disappear." Oney also told him that "no one was going to take [his] child," and that he "would put them six foot under before they take [his] child." These comments so disturbed the co-worker that he did not associate with Oney outside of work. On one occasion, Oney made a similar comment to H.O.'s father. During a phone conversation in the fall of 2021, Oney said "if anybody ever tries to keep [Oney and his daughter] apart, . . . that's how people end up in the morgue."

Oney and H.O. had another argument on March 19, 2022. H.O. left the house in Charter Oak, Iowa, contacted law enforcement and obtained from a judge a temporary protective order that restrained Oney "from committing further acts of abuse or threats of abuse" and "from any further contact with" H.O. and their

daughter, and gave H.O. temporary custody. The protective order also specifically provided that Oney "shall not go to . . . any . . . residence in which the protected party is staying, under any circumstance." H.O. then went with her daughter to her parents' house in a rural area outside of Dow City, Iowa, as she had done before when parting from Oney. Also living in the house were H.O.'s mother, father, and eleven-year-old brother.

Oney was eventually served with the temporary protective order at 4:29 p.m. on March 26, 2022. Shortly after midnight, approximately eight hours after Oney had been served, H.O. awoke and looked out the bedroom window to discover that the front of the house was on fire. She proceeded to open the front door and saw fire along the railing of the front porch over toward the window of the bedroom where she had been asleep with her daughter. H.O. yelled and woke up the entire family, all escaping out the back door. H.O. had to help her father lift her mother down the back stairs, as she is confined to a wheelchair.

H.O. called 911 and reported the fire. The family made it to their vehicles and drove a safe distance away as the house burned. From their vantage point, they were able to watch as firefighters and first responders arrived. H.O. noticed another vehicle drive by—a black Buick Enclave—which she immediately recognized as Oney's since she had driven it many times. As H.O. watched the SUV pass by in front of the headlights of her vehicle, she saw Oney in the driver's seat. Their daughter also saw him and said, "There's daddy." H.O.'s parents also recognized Oney as he drove slowly past. H.O.'s father thought Oney's presence suspicious and followed the SUV long enough to read the license plate number and call 911 to report it to police. Several firefighters recalled seeing a dark SUV

"backed in" by some grain bins, facing the road, while they were en route to the fire, although none could identify a driver.

After H.O.'s father reported Oney's license plate number to 911, Crawford County sheriff deputies went to Oney's residence around 1:50 a.m. Oney and the Buick Enclave were not there. When Oney was eventually interviewed by law enforcement, he gave two conflicting stories to explain where he had been around the time of the fire. During those interviews, he disclosed how upset he was when served with the protective order and made another threat against H.O.'s life. Oney concluded by saying that no matter how angry he was at H.O., "that doesn't excuse what I might have done." Several months after his arrest, Oney gave a third version of events to his mother in recorded jail phone calls, in which he claimed H.O. had called him and requested that he come to her parents' home.

Investigators found several items discarded along the side of the road near the burned home, including a blue propane torch, a brown sweatshirt, and a pair of dishwashing gloves. H.O. identified the brown quarter-zip sweatshirt as one she had purchased for Oney for Christmas the year before. She also identified the rubber gloves as the ones she used to wash dishes when she lived with Oney at the Charter Oak home, specifically noting a tear in the index finger of the right-hand glove. A video camera recording at a bar in Charter Oak on the night of March 26, 2022, showed Oney wearing a quarter-zip sweatshirt and leaving at 10:30 p.m. Data from Oney's cellphone showed a gap in usage from 11:29 p.m. on March 26, 2022, to 1:27 a.m. on March 27, 2022, and that the phone's first use after the fire was a ping off a cell tower two-and-a-quarter miles from H.O.'s parents' home.

Law enforcement investigators determined the fire was arson with use of accelerants. Forensic chemical analysis conducted at the State of Iowa's Division of Criminal Investigation crime lab confirmed the presence of gasoline. A trained fire department dog detected traces of fire accelerants and ignitable liquids on bags containing the rubber gloves and quarter-zip sweatshirt found along the side of the road, and in Oney's Buick Enclave. The dog also alerted to accelerants in several places around H.O.'s parents' home. One of Oney's neighbors testified that after the fire, at Oney's request, he secured Oney's garage and saw that a smaller red plastic gasoline container was missing.

The State charged Oney with arson in the first Degree, a class "B" felony, in violation of Iowa Code section 712.1 and 712.2 (2022); five counts of attempted murder, class "B" felonies, in violation of Iowa Code section 707.11(1) and 707.11(2); criminal mischief in the first degree, a class "C" felony, in violation of Iowa Code section 716.1, 716.3(1)(a) and 716.3(2); and neglect or abandonment of a dependent person, in violation of Iowa Code section 726.3.

During his jury trial, Oney represented himself during the State's case-in-chief. When the State rested, at Oney's request, the court appointed his standby counsel to represent him for the remainder of the trial. The jury returned guilty verdicts of arson in the first degree, attempted murder as to H.O., criminal mischief in the first degree, and neglect or abandonment of a dependent person. On the attempted murder charges as to the other occupants, the jury found Oney guilty of the lesser included offense of assault.

The court sentenced Oney to a total indeterminate term of incarceration of seventy years and one-hundred twenty days. He appeals.

**II.    Standard of review.**

> We review [Oney's] challenge to the sufficiency of the evidence for the correction of errors at law, viewing the evidence in the light most favorable to the State. In doing so, we are bound by the jury's verdict if it is supported by evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt.

*State v. Brown*, 996 N.W.2d 691, 695–96 (Iowa 2023) (cleaned up for readability).

**III.    Analysis.**

Oney's sole appeal issue is that "[t]here was insufficient evidence to find the defendant was the person who committed the offenses charged in this case." He acknowledges that there was a fire and that expert testimony supported that it was intentionally set. But Oney argues that neither H.O. nor any family member saw anyone around the house when the fire was first discovered. He concedes that H.O., her father, and her mother first saw his vehicle and also identified him as driving on the road by the house when the fire trucks first arrived, but he argues this was forty minutes after they discovered the fire. He argues since no one saw him start the fire or in the vicinity when it was set, the evidence is insufficient and the jury verdicts should be set aside.

There was substantial evidence for the jury to conclude Oney set the fire. Oney seeks to have us ignore the significant circumstantial evidence that was available to the jury that supports the verdicts. *See State v. Knox*, 18 N.W.2d 716, 724 (1945). The State established a motive for Oney's criminal conduct: being served with a no-contact order that gave exclusive custody of the parties' daughter to H.O. just hours before the fire after making many threats against H.O. on that point. Many witnesses identified Oney and his vehicle on the

scene, including his toddler daughter. His brown quarter-zip sweatshirt and kitchen gloves were found discarded along the side of the road not far from the burned house, along with a torch. Scientific testing found the presence of gasoline—the accelerant used to start the fire—in three samples tested: the discarded kitchen gloves, a section of fabric from the cargo area of Oney's SUV vehicle, and a soil sample taken near the house where H.O. initially saw a "line of fire." A gas can was also missing from Oney's garage. So although no one saw Oney light the fire, ample evidence in the record would convince a rational juror beyond a reasonable doubt that he was the arsonist. Substantial evidence supports the verdicts, so we affirm.

**AFFIRMED.**