**IN THE COURT OF APPEALS OF IOWA**

No. 24-0263
Filed February 5, 2025

**PATTI ENGLEHART,**
        Plaintiff-Appellant,

**vs.**

**FIRST CAPITOL BAKING, INC. and DAN SERRA, Individually and in his Corporate Capacities,**
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Des Moines County, John M. Wright,

Judge.


        The plaintiff in a wrongful termination case appeals several evidentiary

rulings made by the trial court.  **AFFIRMED**.


        Emily E. Wilson, Melissa C. Hasso, and Mark D. Sherinian of Sherinian,

Hasso & Wilson Law Firm, Des Moines, for appellant.

        Leslie Behaunek, Frank B. Harty, Katherine D. Hamilton (until withdrawal),

and Haley Y. Hermanson (until withdrawal) of Nyemaster Goode, P.C., Des

Moines, for appellees.


        Heard by Greer, P.J., and Buller and Langholz, JJ.

**GREER, Presiding Judge.**

After being terminated from her employment on July 9, 2021, Patti Englehart filed suit against First Capitol Baking, Inc. and Daniel Serra, the owner, (collectively First Capitol Baking) alleging one count of wrongful termination in violation of public policy. Englehart contended she was fired because she complained about a deduction in her paycheck. First Capitol Baking asserts she was fired for cause— poor performance and because she consistently "created drama" at the baking company. After a four-day trial, the jury returned a verdict in favor of First Capitol Baking. Englehart now appeals on a variety of evidentiary grounds. Finding no abuse of discretion or reversible error in the district court's evidentiary rulings, we affirm.

**I. Background Facts and Proceedings**.

Serra, who owns a Massachusetts baking company, became interested in a non-operational baking facility in Iowa and bought it to restart it as a new company called First Capitol Baking, Inc. Deb Zimmerman, Englehart's best friend, was recruited to work as the plant manager at First Capitol Baking, Inc. In April 2021, Zimmerman recommended Englehart for employment as a "safe quality food practitioner" (SQF), even though she was not yet certified for the position. The company attempted to train Englehart. However, by early May, the food safety director, Jeff McCarroll, hired Rebecca Garrett to replace Englehart as the SQF. McCarroll advocated for Englehart's termination because of the "drama" she caused and her poor performance. But after discussion with Serra and Zimmerman, Englehart was given another chance and was moved from the SQF

position to work as the human resources representative. All in all, Englehart's term of employment lasted less than four months; she was terminated on July 9, 2021.

On July 8, in a series of events described at trial as the "final straw," Englehart noticed a deduction from her paycheck—it was short by a day's pay. Confused by the deduction, Englehart followed the chain of command, first calling Sarah Kellogg, the administrative assistant who handled payroll for Serra's baking companies. Not able to connect, Englehart left a message. Hearing no reply, Englehart sent a text message that evening to the plant manager, Bruce Forman, asking if he knew anything about the discrepancy. Forman replied, stating he would have to "ask Sarah." Englehart messaged back that she had tried to ask Kellogg but had to leave a message for her. Next, Englehart called McCarroll; he also told her to contact Kellogg about the issue. Later that same night, Englehart, frustrated at this point, decided to send Serra a text message, which said:

> I'm sorry to contact you directly, but I can't get any answers from anyone else and didn't know if you could help. My check was about $150 short, and I wasn't sure why. I don't have my Checkwriters login information in front of me.
> I went through the proper order to get to you. I even talked to Jeff. If you don't know why it's short, that's fine, but if you do, I figured you would be the one to tell me.
> And I know you can't be disappointed - mad at me for not doing my job because between Jeff, Russ and Bruce I don't even know what my job is.

Around 5:35 a.m. the next day, Serra replied to Englehart, informing her the deduction was a result of her "call-out" from work on July 2; Englehart could not get to work that day because of a flat tire. Englehart responded with a series of six text messages, attempting to explain why she believed her check should not have had any deduction. She included a retort: "If I'm going to get deducted like

hourly people maybe I should just go hourly??!" After these messages were sent but before Serra could respond, Forman called Serra and told him there was a "situation" at the plant; Englehart had been telling other employees she was not getting paid and they would not be paid. With this information in hand, Serra sent another message to Englehart later that morning:

7/9/21, 11:43 AM

I spoke to you at 6:35 am

You explained to me above

Why did you feel the need to call Bruce and leave a voicemail about the SAME thing you talked to me about?

Serra and Englehart testified differently as to whether Serra actually called at 6:35 a.m. and spoke to Englehart the morning of July 9. Englehart testified that Serra did not call until five to ten minutes after receiving her last text message, during which Serra terminated Englehart's employment. Serra said he called Englehart before he called to terminate her.

Evidence presented at trial showed that before she started at First Capitol Baking, Inc., Englehart told employees that the former owners of the bakery were watching them through surveillance cameras, even though First Capitol Baking, Inc. now owned and maintained the manufacturing facility. Through testimony and exhibits, First Capitol Baking described other efforts by Englehart to cause "drama" at the plant despite her role as the human resource representative. Englehart denied any effort to cause drama, insisting she was a good employee and performed her job well.

In the company's view, Zimmerman and Englehart were "attached at the hip," engaging in acts and gossip that disrupted the work force. An exhibit setting out messages between the two while they were both still employed at the baking company referenced recording conversations of employees in the workplace. The discussion went so far as to debate the pros and cons of different surveillance methods, including a pen microphone and a baby monitor. As for Englehart's behavior, there was evidence offered that she spread dramatic narratives, for example, telling employees the First Capitol Baking, Inc.'s executives were "watching every key stroke that's made." When an unhappy Englehart was moved to the human resource position, she engaged in gossip and started rumors about her replacement, Garrett. According to First Capitol Baking, she also perpetuated gossip that Forman asked another employee to "set[] something up for the inspectors to find."

Unrelated to Englehart's termination, Zimmerman was placed on leave and, ultimately, her employment was terminated on August 5, 2021. That night, First Capitol Baking, Inc. experienced a break-in, with no evidence of forced entry. First Capitol Baking contended that Zimmerman and Englehart entered the baking facility and stole Englehart's laptop and surveillance hard drive. And at the time of trial, Englehart had possession of a laptop like the one she had at her job with First Capitol Baking, Inc.

After her termination in July, Englehart filed suit against Serra and First Capitol Baking, Inc., alleging wrongful termination. First Capitol Baking denied the claim and affirmatively raised an "after-acquired evidence" defense, contending Englehart was barred from any recovery after the date First Capitol Baking

discovered evidence of her involvement in the break-in.  The matter proceeded to a jury trial in December of 2023.  After four days of trial, the jury returned a verdict in favor of First Capitol Baking, Inc. and Serra.

Englehart moved for judgment notwithstanding the verdict and for a new trial, alleging among other things that the court made improper evidentiary rulings concerning Serra's testimony and several admitted exhibits.  As to Serra's testimony about the July 8–9 check fiasco, the district court determined Serra's reference to Forman's statements about the "situation" were not offered to prove the truth of the matter asserted but to show the employer's state of mind over controversy created by Englehart.  Although the district court concluded that most of the exhibits challenged by Englehart established the "drama" Serra considered before the termination, it reversed its position on two exhibits that involved conversations after Englehart was terminated.  As to those two exhibits, the court found that their admission was not prejudicial to Englehart given the strength of the other evidence.  Englehart now appeals.

## II.  Standard of Review.

"Although we generally review a court's decision to admit or exclude evidence for an abuse of discretion, we review a hearsay claim for correction of errors at law."  *State v. Neitzel*, 801 N.W.2d 612, 621 (Iowa Ct. App. 2011).  "An abuse of discretion occurs when a district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable."  *State v. Wilson*, 878 N.W.2d 203, 210–11 (Iowa 2016).  "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law."  *Graber v. City of Ankeny*, 616 N.W.2d 633, 638

(Iowa 2000).  We reverse for an evidentiary error only if it "affects a substantial right of the party."  Iowa R. Evid. 5.103(a); *see also State v. Paredes*, 775 N.W.2d 554, 571 (Iowa 2009) ("Reversal of a ruling which admits or excludes evidence is not necessary unless a substantial right of a party is affected.").

## III.  Discussion.

Englehart makes two main arguments.  First, she contends the district court erred when it admitted "triple hearsay" evidence during Serra's testimony, which was prejudicial to her case.  Second, pointing to a variety of alleged evidentiary mistakes by the district court, Englehart urges that the cumulative effect of those improper rulings created prejudice.  We review Englehart's evidentiary challenges separately, taking into account the record made below and how those challenges come to us.

## A.  Hearsay on Hearsay Evidence: Serra Testimony.

At the core of Englehart's appeal is her argument that Serra improperly repeated statements which contained hearsay, testifying to hearsay within hearsay.  Specifically, she argues there are three layers of hearsay contained in the statements Serra referenced at trial: (1) Englehart's alleged statements telling unidentified employees she is not getting paid and that no one was going to receive a paycheck;[1] (2) Unidentified employees' statements allegedly telling Forman that Englehart made these comments; and (3) Forman's statements to Serra about these alleged reports from unidentified employees.

---

[1] Englehart conceded that any of these alleged statements to employees would be admissible under Iowa Rule of Evidence 5.801(d)(2).

The admission of Serra's testimony and Englehart's objection played out in this exchange:

> DEFENSE COUNSEL: And did you speak with Mr. Forman about [Englehart's] statements in the workplace regarding what she thought to be an improper deduction on her check?
> SERRA: Yes—
> . . . .
> DEFENSE COUNSEL: What did Mr. Forman tell you about statements that [Englehart] was making in the workplace after you spoke to her over the phone?
> PLAINTIFF'S COUNSEL: Calls for hearsay.
> DEFENSE COUNSEL: We're not offering it for the truth of the matter asserted, Your Honor, but rather for the fact that the decision maker heard it.
> PLAINTIFF'S COUNSEL: It is effectively double hearsay.
> THE COURT: Counsel approach.
> (A conference was held at the bench between counsel and the Court.)
> THE COURT: Objection's overruled.
> SERRA: Mr. Bruce Forman . . . calls me and says, "Dan, we have a problem. Patti [Englehart]'s going around telling everybody that you're not paying her, she's not getting paid, and nobody's getting paychecks. We have a situation here."

To show the district court's alleged error, Englehart points to the first time Serra attempted to discuss the July 9 phone call between Serra and Forman during her case-in-chief. On direct examination of Serra, when he attempted to testify as to what Forman told him, Englehart objected on hearsay grounds and the district court sustained the objection. Then, she asserts, the district court waffled on whether such evidence was admissible. On day two of trial, during cross-examination of Serra by defense counsel, the court reversed course, allowing the exchange set out above. Finally, on the third day of trial, during First Capitol Baking's case-in-chief, when Serra was asked again about the July 9 call, the court sustained the objection to the testimony on hearsay grounds. After the verdict, when Englehart raised this hearsay issue in her motion for new trial, the district

court found that Serra's statements about what Forman told him were properly admitted because they were not offered for their truth but to show Serra's state of mind when he terminated her employment.

On appeal, First Capitol Baking raises two responses to the merits of Englehart's hearsay challenge.[2] But it also asserts that Englehart "introduced the very hearsay she challenges on appeal." It is this last argument that resolves Englehart's first challenge. First Capitol Baking points to Serra's live testimony and the testimony given during his videotaped deposition, played during trial, to show Englehart introduced the content that she now insists should not have been given to the jury. In that deposition, Serra testified as follows:

> PLAINTIFF'S COUNSEL: Can you list for me all of the reasons that you decided to terminate Ms. Englehart?
>
> SERRA: Sure. . . . She told me that there was an issue with her check. And I intentionally do not do payroll or do anything to do with that. The office takes care of that on purpose.
>
> So I told Ms. Englehart that I would take care of it and I will make some phone calls and figure out what's going on.
>
> And after I said that to Ms. Englehart, she then went to tell other people at the plant that her check was wrong, that she wasn't getting paid, et cetera, et cetera.
>
> And [Forman][3] alerted me to this, and then I called [Englehart] and I said, "Stop causing drama. You're fired," because at that point you're creating an environment where you're telling employees the wrong information, essentially lying to them. So the last thing you want to do is create an environment where other employees, even if it's one, 10, 20, 30, 50, doesn't matter, are listening to somebody tell you something that's not truthful. That causes drama, and I have no tolerance for that at all.

---

[2] First Capitol Baking argues that because the issue at trial involved Serra's good-faith belief about Englehart's conduct leading to termination, the testimony was not hearsay and, even if the court erred on its admission, there was no prejudice to Englehart by allowing these statements.

[3] During the deposition, Serra initially named someone other than Forman. Later, in a part of the deposition we have not quoted, he corrected his earlier mistake.

> So I fired [Englehart] because I told her, "I will take care of it. I will deal with it. I will get back to you." And minutes later, you know, she is telling other people at the plant that she's not getting paid . . . .
>
> . . . .
>
> PLAINTIFF'S COUNSEL: . . . So Mr. Foreman informs you that [Englehart] has told others about the paycheck situation, is that correct?
>
> SERRA: . . . Essentially Mr. Forman was telling me the same thing that [Englehart] had just told me, and I told her I would take care of it. That's essentially what happened is [Englehart] told me a problem. I told her I'd fix it. Then for whatever reason, right or wrong, she decided to go tell other people and cause drama, and that's why I fired her.

Then during trial, on direct examination of Serra, Englehart asked, "Now, you also claim that . . . Englehart told other employees that she was, quote, not getting paid, end quote; correct?" And he replied, "Correct."

Against that backdrop, we see no appreciable difference in what was conveyed to the jury through what Englehart introduced during her questioning of Serra and what she now claims was improperly admitted evidence. Englehart cannot have it both ways, In other words, she cannot submit the hearsay and then object to the exact same hearsay evidence. *See, e.g.*, *Jasper v. State*, 477 N.W.2d 852, 856 (Iowa 1991) (noting one "cannot deliberately act so as to invite error and then object because the court has accepted the invitation"); *McCracken v. Edward D. Jones & Co.*, 445 N.W.2d 375, 378 (Iowa Ct. App. 1989) ("[I]t is elementary a litigant cannot complain of error which he has invited or to which he has assented."). And to the extent Englehart complains that Serra could not insert this same testimony that she solicited into the record, the door was flung open by her

for the jury's consideration. And as we see it, because Englehart cannot complain about evidence she elicited, we will not consider this issue further.[4]

**B. Cumulative Prejudicial Effect of Other Evidentiary Rulings.**

Next, Englehart argues she was prejudiced by several other evidentiary errors committed by the district court, warranting a new trial. The claimed evidentiary errors are defined by the record made at the trial court, so we look to what objections were made there and how the error was presented to the district court. Englehart addresses the admission of ten exhibits that she asserts were improperly admitted for several different reasons. She contends these exhibits were objectionable on their own but even more prejudicial in total. As to the label "cumulative prejudice," Englehart cites no authority applying this concept to civil cases and, without that guidance, we decline to do so. *See Lange v. City of Des Moines,* 404 N.W.2d 585, 587–88 (Iowa Ct. App. 1987) (finding that an argument over the cumulative effect of several improper statements from closing argument would not be considered because there was no authority provided supporting such theory). Having said that, we will address the challenges made to the evidence presented at trial and preserved for our review.

To draw focus, we use descriptions of the content of the challenged exhibits as provided by the parties in their briefing and note in brackets the objections Englehart made:

> Exhibit M – texts between Englehart and Rebecca Garrett, in which Englehart expresses she "can't work for someone like Dan [Serra]," cautions Garrett not to trust him because he is "watching

---

[4] Englehart argues she was prejudiced by the improper admission of this evidence, but we decline to consider whether she was prejudiced by an alleged error that she invited.

every key stroke" on computers, says Serra threatened to fire her because she challenged him on employee break requirements under federal law, shares that she is "looking up the word drama and framing it," and characterizes Serra and McCarroll as bullies and liars; [Relevance].

Exhibit T – texts between Englehart and Garrett, in which Englehart tells Garrett to pick up another employee, J.K., and Garrett declines; Englehart responds that J.K. will say Englehart "cock blocked" him; and Garrett indicates J.K. is not her type. [Relevance].

Exhibit U – texts between Englehart and D.L., another First Capitol Baking employee, in which they talk about flirting and Englehart tells him Garrett and [J.K.] "hooked up"; [Relevance].

Exhibits AA and BB – texts in which Englehart asks two First Capitol Baking employees if Bruce Forman, the plant manager, asked them to "set up" something for the health inspector to find, and both express confusion; [Relevance].

Exhibit EE – texts between Englehart and Zimmerman, in which they discuss recording conversations between members of management; [Relevance and Improper Impeachment with Extrinsic Evidence].

Exhibit FF – texts between Zimmerman and McCarroll days after Englehart's termination, in which Zimmerman says that Englehart "created chaos" and McCarroll agrees she is "toxic"; McCarroll also notes a change in the workplace without Englehart there, saying he believes she made the employees anxious; [Relevance and Hearsay].

Exhibit GG – messages between Zimmerman and Englehart, in which they discuss making "plans" shortly before the break-in at the plant, and Englehart continues to complain about Garrett. [Relevance].

Additionally, exhibit D included WhatsApp communication between Zimmerman and Serra discussing Englehart telling employees prior to her employment that the former bakery had cameras in the facility and were watching them. The objection at trial was hearsay.

And exhibit E included WhatsApp communication between Zimmerman and Serra regarding conflict cause by Englehart about an employee's no call/no show. The objection at trial was hearsay.

Preliminarily, we note First Capitol Baking's assertion that Englehart did not preserve error on her challenges to the admission of exhibits M, T, U, EE, and GG.[5] Englehart moved in limine to resist the admission of some of the proposed trial exhibits and did object during the trial to the admission of these exhibits. First Capitol Baking contends Englehart did not object to all the exhibits and some not on grounds argued until *after* the verdict. Englehart responds that her relevance objections made at trial preserved error, to which First Capitol Baking asserts the relevance objections are preserved, just not other bases she raised later in her motion for new trial. *See State v. Kidd*, 239 N.W.2d 860, 864 (Iowa 1976) (noting a party challenging admission of evidence on appeal "is limited . . . to the specific ground of his objection below"). On most—but not all—of Englehart's challenges to the exhibits, we find sufficient record was made at the district court to preserve the issue on appeal.

To address these evidentiary challenges, we review each objection category, and those exhibits involved, but address exhibit FF and GG separately because those exhibits involve content that came after Englehart's termination of employment.

**i. Relevance: Exhibits M, T, U, AA, BB and EE.**

Evidence must be relevant to be admissible. *See* Iowa R. Evid. 5.402. "Iowa has adopted a broad view of relevancy," *State v. Scott*, 619 N.W.2d 371, 375 (Iowa 2000), and relevance "is a relatively low bar." *State v. Thoren*, 970 N.W.2d 611, 622 (Iowa 2022) (citation omitted). "Evidence is relevant if it can

---

[5] As to exhibits E, D and FF, First Capitol Baking does not dispute error preservation.

'throw any light upon the matter contested.'" *State v. Buelow*, 951 N.W.2d 879, 885 (Iowa 2020) (quoting *State v. Knox*, 18 N.W.2d 716, 723 (1945)). "Relevancy relates to the tendency of evidence 'to make a consequential fact more or less probable.'" *State v. Cromer*, 765 N.W.2d 1, 8 (Iowa 2009) (citation omitted). "Whether the necessary minimum level of logical connection between the offered evidence and the fact to be proven exists is a legal question lying within the broad discretion of the trial court." *State v. Thompson*, 954 N.W.2d 402, 407 (Iowa 2021) (citation omitted).

Englehart contends on appeal that the contents of exhibits M, T, U, AA, BB, and EE were irrelevant to any issue at trial because Serra, "the sole decisionmaker, did not know about these conversations or the issues discussed in the conversations." In response, First Capitol Baking contends the district court did not abuse its discretion in allowing it to present evidence that supported their defense and that Serra knew of the general "drama" created by Englehart. The district court determined that many of the exhibits (M, T, U, AA, BB, and EE) showed examples of Englehart provoking trouble during her tenure at the company and thus, went towards First Capitol Baking's defense.

Here, the record belies Englehart's claims that Serra was unaware of the overriding issues discussed in the various messages. The district court considered Engelhart's relevance objection for each but found that these exhibits went towards First Capitol Baking's defense that Englehart caused unnecessary turmoil in the workplace. Englehart posits that the purpose for this evidence was to "make her look bad to the jury." But, in a wrongful-termination case, it is logical that the evidence brought forward might put the employee in a bad light because the

defense plan would involve setting out reasons for the discharge that do not involve a violation of public policy. *See Carver-Kimm v. Reynolds*, 992 N.W.2d 591, 598 (Iowa 2023) (reiterating that "Iowa generally adheres to the employment-at-will doctrine" and describing discharge in violation of public policy as a "narrow exception" to the rule that employment may be terminated "at any time, for any reason" (citation omitted)). The conduct of an employee thus becomes part of the proof related to the elements of the tort or in defense of the tort. *Id*.; *see also Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 289 (Iowa 2000) ("[T]he existence of other legal reasons or motives for the termination are relevant in considering causation.").

With that backdrop, we find that the district court did not abuse its discretion in admitting exhibits M, T, U, AA, BB, and EE on relevance grounds. These exhibits raised issues about the work behavior of Englehart that supported testimony introduced without objection. For example, Englehart admitted during cross-examination that as a human resource director she should not be gossiping about the romantic relationships at the workplace. Then Serra testified, without objection, that the employees he trusted consistently stated to him that "[Englehart's] got to go." Following that testimony, Serra testified—again without objection—to what McCarroll told him: "She needs to go. She was going to cause drama if we keep her at the facility. Rebecca's still there. They don't get along. They didn't get along at Blackhawk. It's just going to cause trouble. She's got [to] go, Dan." Serra did not terminate Englehart at that time because he felt sorry for her. On top of that, Serra answered in the affirmative that "the reason [he]

terminated Ms. Englehart on July 9th was all of the drama that she had created that *culminated* on July 9th." (Emphasis added.)

Given the "low bar" for a determination of relevance, *Thoren*, 970 N.W.2d at 622, we have little trouble connecting these exhibits with the core issues advocated at trial. Although Englehart points to testimony that the main issue resulting in termination was the July 8 and 9 incident surrounding her paycheck, the record is replete with problems Englehart instigated throughout her tenure, which Serra knew about in one form or another. McCarroll testified that Englehart was "constantly calling [Serra], calling me, with wild accusations about things." And as First Capitol Baking asserts, the evidence was responsive to rebut Englehart's attempts to characterize herself as a model employee. Exhibits M, T, U, AA, BB, and EE were properly admitted.

**ii. Improper Impeachment with Extrinsic Evidence Under Rule 5.608: Exhibit EE.**

In her motion for new trial, Englehart raised a new objection to the admission of exhibit EE and contended that the exhibit also constituted improper impeachment through the use of extrinsic evidence in violation of Iowa Rule of Evidence 5.608(b). That rule provides that "[e]xcept for a criminal conviction under rule 5.609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Because this objection comes at the motion for new trial stage of the proceedings and was not made during trial, we find that Englehart failed to preserve error. *See Mitchell v. Cedar Rapids Cmty. Sch. Dist.,* 832 N.W.2d 689, 695 (Iowa 2013) ("It is well-settled that a party fails to preserve error on new

arguments or theories raised for the first time in a posttrial motion."); *State v. Vonk*, No. 23-1443, 2024 WL 4370601, at *4 (Iowa Ct. App. Oct. 2, 2024) ("Raising an evidentiary objection via a motion for new trial is not sufficient to preserve error when proper objections were not made during trial."). Thus, we do not consider this argument further.

### iii. Hearsay: Exhibits D and E.

Englehart argues that exhibits D and E should not have been admitted because they contain two different text message conversations between Serra and Zimmerman and contain inadmissible hearsay—specifically Zimmerman's out-of-court statements. In each of these exhibits the conversations focused on "drama" caused by Englehart. Exhibit E contained messages between Serra and Zimmerman, with Serra sending Zimmerman the following:

> When [Englehart] sends [Kellogg] an email where she writes, "Travis is a no call no show," what kind of response do you think that sets off at home office?
> Because everyone knows Travis['s] position and what he commanded for pay.
> What types of questions do you think it starts to raise at home office?
> If it wasn't a big deal and you had it under control and you thought to yourself, "we're saving $$$ and don't really need him"— THEN [ENGLEHART] CAUSED A TREMENDOUS AMOUNT OF DRAMA SIMPLY BY MAKING IT SEEM LIKE SHE NEEDED TO DOCUMENT TRAVIS' NO CALL NO SHOW.
> Whatever works for you, works for us.
> But when I have [Kellogg] telling me and SHOWING me what [Englehart] sent and questioning, "What is going on in Iowa?"
> So what I'm figuring out is . . . . . this Travis thing isn't a big deal to you—which is fine as long as you're fine [heart emojis]
> WHY IS PATTI CAUSING DRAMA and saying she's going to update the employee handbook and wrote notes on people's files?
> This is the second time I've personally witnessed drama from her. The first was "if [Garrett] comes [Zimmerman] is quitting."

(Ellipses in original.)

On its face, Exhibit D, which featured additional messages sent between Serra and Zimmerman, described "drama" Englehart "caused" prior to her employment with the company. It stated in part:

> On Thursday [Englehart] told you that [Blackhawk was] watching us on the cameras that were downtown [at the First Capitol Baking, Inc. facility] from their computers . . . .
> Previously, [Englehart] had told you there were cameras downtown.
> This does bother me because it created drama. Even if it wasn't a huge deal, it just wasn't accurate. Like not even close. There is not a single camera downtown.

First Capitol Baking argued at trial exhibit D was not being offered for "the truth of the matter asserted . . . but rather for the fact that Mr. Serra, as the CEO, heard those things and acted on them." As First Capitol Baking asserted, the truth of the statements was irrelevant as they were only offered to show Serra's state of mind involving the workplace behavior of Englehart as he "heard the statements and acted on them." *See McElroy v. State*, 637 N.W.2d 488, 501 (Iowa 2001) (noting an out-of-court statement can be admissible "if it is offered for a non-hearsay purpose that does not depend upon the truth of the facts presented"). Although exhibit D discussed Englehart's pre-employment behavior, it still goes to knowledge Serra had concerning her dramatic assertions and was not offered to prove the truth of what was stated in the messages. "As the reasons for Englehart's termination from employment was central to the case, it was part of First Capitol Baking's defense to show the reasons Serra was at the "last straw" in her tenure. "[W]hen the out-of-court statement is used to prove something other than the truth of the matter asserted, such as responsive conduct, the statement

may be admissible as nonhearsay." *State v. Dessinger*, 958 N.W.2d 590, 603 (Iowa 2021).

Thus, we find that the district court did not err in admitting exhibits D and E for the purpose of showing the rationale behind Serra's response to terminate Englehart as the exhibits were being offered for a non-hearsay reason.

### iv. Improper After-Termination Evidence: Exhibits FF and GG.

Englehart objected to exhibit FF on both hearsay and relevance grounds but only made a relevance objection to exhibit GG. When ruling on Englehart's motion for new trial, the court did change course and decided its admission of exhibits FF and GG were improper because they contained conversations that took place *after* Englehart was terminated. However, it determined that in the big picture the entry of those exhibits did not materially affect Englehart's substantial rights, so a new trial was not warranted. In its reasoning, the district court ruled that since the contents of the messages were similar to the information found in the admissible exhibits illustrating Englehart's acts of instigating conflict, the admission of exhibits FF and GG was not prejudicial to Engelhart. On this point, Englehart strongly disagrees, and she emphasizes that the participants in these messages were not the decisionmakers involved in the termination. Englehart asserts First Capitol Baking failed to show that the decisionmaker—Serra—knew anything about the content of these messages.

We start with exhibit FF, which contains text messages between McCarroll and Zimmerman after Englehart was terminated. As the content pertained to Englehart, there was a comment by Zimmerman that "[Englehart] has created chaos for me" and a response by McCarroll stating "I believe it" and "[Englehart] is

toxic." Then, McCarroll noted that "the tenor with out [Englehart] has changed. I think she made the staff very anxious." The messages were offered to show Englehart's lasting effect on the work environment, directly pertaining to the core dispute in this case: Englehart causing trouble and creating an agitated work environment. The messages, therefore, constitute out-of-court statements offered to prove the truth of the matter asserted, meaning they were hearsay. The question is whether Englehart is entitled to a new trial based on the improper admission of the exhibits.

"[U]nless the record shows the contrary, we presume improperly admitted hearsay evidence is prejudicial to the nonoffering party." *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 265 (Iowa 2019). And "[w]hen inadmissible hearsay evidence directly addresses a hotly contested central dispute of the parties, it is harder for us to find the evidence nonprejudicial." *Id.* at 267. Still, this prejudice can be overcome if the challenged evidence did not impact the jury's verdict. *Id.* at 266–67. One way to establish the hearsay evidence did not impact the jury's verdict is if there is overwhelming evidence on the same issue for which the hearsay was introduced, thereby "making the prejudicial impact of the hearsay evidence insignificant." *Id.* Another is by showing the hearsay evidence was "merely cumulative." *Id.* at 267. On this note, the district court did not find prejudice in the admission of exhibit FF because it was only part of a collection of testimony and exhibits showing Englehart caused unnecessary turmoil in the workplace. *See State v. Rice*, 543 N.W.2d 884, 887 (Iowa 1996) ("[P]rejudice is not established where substantially similar evidence has been admitted but not objected to."); *State v. McGuire*, 572 N.W.2d 545, 547 (Iowa 1997) ("[T]he court will not find

prejudice if substantially the same evidence has come into the record without objection.").

We agree with the district court that exhibit FF contained hearsay but its admission did not prejudice Englehart because of the extensive nature of the properly admitted evidence. And because Englehart was not prejudiced by the admission, her substantial rights were not impacted, so a new trial was not warranted.

As for exhibit GG, Englehart raised a relevance objection, but First Capitol Baking asserted the exhibit was offered for its after-acquired evidence defense. Characterizing the content in the text messages between Zimmerman and Englehart as a "plan" to break into the factory, First Capitol Baking asserts this message expressly stated that the two ex-employees needed to "make plans" and that Englehart would get a "disposal" cell phone if she could afford one. The district court instructed the jury that the use of this information was limited to the question of damages, if the jury reached that hurdle. Unchallenged jury instructions become the law of the case. *In re Est. of Workman*, 903 N.W.2d 170, 175 (Iowa 2017). As discussed at trial, the after-acquired evidence doctrine would only come into play if the jury decided Englehart was owed damages. The information might mitigate any damages owed to Englehart, limiting the accrual of damages from the time between when she was improperly terminated to the time that Englehart allegedly broke into the company building, a proper basis for termination. After reviewing the record, we find exhibit GG was relevant to the after-acquired evidence defense. Thus, the court could admit the contents of GG for this purpose.

## IV. Conclusion.

Based upon the reasoning above, we affirm.

**AFFIRMED.**